SEBASTÍAN AMARAL AMARAL, demandante y recurrente, *v.* DR. ROBERTO F. FORTUÑO y TRAVELERS INDEMNITY COMPANY demandados y recurridos.

*Número:* R-63-120    *Resuelto:* 23 de diciembre de 1966

*Noel Colón Martínez* y *Miguel A. Velázquez Rivera,* abogados del recurrente; *F. Fernández Cuyar* y *Rafael A. González,* abogados de los recurridos.

Sala Segunda integrada por el Juez Asociado Señor Belaval como Presidente de Sala, y los Jueces Asociados Señores Santana Becerra, Blanco Lugo y Ramírez Bages.

EL JUEZ ASOCIADO SEÑOR RAMÍREZ BAGES emitió la opinión del Tribunal.

La cuestión a resolver es si un médico especialista en urología responsable por los daños sufridos por un paciente recién operado del desprendimiento de la retina de un ojo,

condición conocida por el urólogo, al caerse dicho paciente de la mesa de exámenes en el consultorio del médico, luego de éste haber terminado de examinarlo. Creemos que la prueba demostró, contrario a lo que concluyó el tribunal de instancia, que el médico fue negligente al no ayudar al paciente a bajarse de la referida mesa de exámenes y que, por lo tanto, debe responder por los daños que la caída ocasionó a dicho paciente.

Sebastián Amaral, de 71 años de edad, luego de ser operado de cataratas en ambos ojos, sufrió un desprendimiento de la retina del ojo derecho de lo cual fue operado en 6 de febrero de 1962. Esta situación provino de una caída que sufrió al tratar de sentarse en una silla. Antes de eso, la visión por el ojo derecho estaba reducida a un 50 a 60% con lentes. Luego de la caída la referida visión por ese ojo bajó a un 5%. El oculista que lo operó, Dr. Federico Maestre, testificó que volvió a ver al señor Amaral en su consultorio, el 23 del mismo mes de febrero de 1962; que "El fondo del ojo se veía todavía turbio, así que no se podía decir en definitiva cómo iba a quedar el desprendimiento que él había tenido. Eso a veces tarda un mes en decidirse si la retina pega o no después de la operación"; que "como está hoy en día la cosa de retina, el 60% de la retina pega y el 40% no se pega, ocurra o no un trauma"; que de resultar la operación podía restituirse la visión al 50% que le quedaba antes del desprendimiento. Esta reducción de la visión con anterioridad al desprendimiento en cuestión se debió a una patología degenerativa, condición ésta que podía hacer fracasar la operación que se llevó a cabo, pues "no es lo mismo empezar con un ojo en 20/20, que tiene un desprendimiento, a empezar con un ojo que ve la mitad y tiene un desprendimiento, o sea, una operación es distinta de una persona joven a una persona de edad"; añadió que tenía percepción de luz después de la operación; que la condición del órgano visual también era mejor que antes; que le recomendó al paciente se examinase

la próstata pues durante su estadía en la clínica tenía que levantarse con frecuencia a orinar. A esos fines le recomendó al recurrido Dr. Fortuño, quien había examinado al señor Amaral en la clínica Pavía poco antes de la operación en cuestión y lo vio allí durante 10 ó 12 días, antes y después de la operación de la cual el Dr. Fortuño se enteró entonces. Dice el Dr. Maestre que él le pidió al Dr. Fortuño que viera al señor Amaral después de operado porque sospechaba que estaba mal de la próstata. Le explicó que "los pacientes de retina no deben estarse levantando así, [el hombre estaba toda la noche levantándose] tan a menudo de la cama"; que su conversación con el Dr. Fortuño giró en torno a que era conveniente que el paciente Amaral tuviera el menor movimiento posible.

El 23 de febrero de 1962, luego que el Dr. Maestre le examinó y trató el ojo recién operado, el paciente Amaral fue al consultorio del Dr. Fortuño acompañado de su hijo. Testificó el recurrente que de la sala de espera pasó "al sitio donde hacen los exámenes"; que su hijo se quedó afuera; que el Dr. Fortuño lo mandó a desvestir; que le hizo un examen de la próstata mientras permanecía de pie; que luego le ordenó subir a la camilla lo que hizo con la ayuda del médico recurrido, ayuda que el paciente solicitó porque no veía bien; que después que terminó el doctor de examinarlo éste le dijo que se bajara; que le dijo "Bájese", y al darle esa orden (el recurrente quiere decir el Dr. Fortuño) continuó andando a la derecha de la posición en que se encontraba; que entonces el recurrente se sentó quedándole los pies a ambos lados de la camilla; que "cuando me incorporé para bajarme, pues, perdí el control y busqué donde agarrarme y no pude y caí al suelo, sufriendo una herida en la frente"; que trató de sentarse pero el Dr. Fortuño le ordenó se acostara en el piso y empezó a hacerle presión en la frente; que al poco tiempo pidió le llamasen a su hijo y entre los dos lo subieron a la camilla; que el doctor llamó a la clínica Pavía y también una

ambulancia que condujo al señor Amaral a dicha clínica donde luego de examinarlo lo curaron. En contrainterrogatorio dice que antes del accidente "cuando él [el Dr. Maestre] me quitaba el vendaje, veía el movimiento de sus manos con el ojo"; que antes podía leer con el izquierdo; que después del accidente no puede leer con ese ojo. Repitió en contrainterrogatorio su versión de cómo se cayó de la mesa de exámenes. Dijo que "Cuando él me dijo que me bajara, pues me senté. Entonces me quedaron los pies a ambos lados de la camilla. Cuando traté de cambiarme para bajarme, me incorporé, pues, me fuí y traté de agarrarme y me fuí al suelo"; que en ese momento el Dr. Fortuño estaba como a 5 ó 6 pies de distancia de él, caminando de espaldas al paciente. El Tribunal observó que el recurrente se veía joven para su edad; que "no representa su físico la edad que tiene."

El Dr. Maestre testificó que una persona de 70 años con problemas de retina y visión en general requiere mucho cuidado "porque el trauma es importante . . . hay que tener mucho cuidado con ellos"; que la dificultad de la visión puede afectar su equilibrio; que la circulación no es buena en el cerebro, que este criterio es conocido por los profesionales; que cuando el señor Amaral fue a verle, lo ayudó a sentarse en la silla de examen, pues ésta es un poco alta; que el hijo lo acompañaba "pero velándolo al cuidado directo de él." Añadió el Dr. Maestre que "si yo lo hubiera ido a examinar lo hubiera ayudado a acostarse y si se fuera a levantar pues, lo hubiera atendido . . . a que se levantara"; que era posible que fuera peligroso dejarlo bajar de una camilla sin ayuda.

Por el contrario, el Dr. Fortuño testificó que el recurrente llegó a su consultorio por sus propios pies; hablaba coherentemente. El doctor le indicó que se quitase la ropa. Lo hizo y la colgó en un gancho especial para eso; orinó en un vaso de cristal que le dio el doctor. Éste le indicó que subiese a la mesa y subió; que como el examen prostático es lo último que hace, esa tarde no se lo hizo; que luego de

tomarle la presión y examinar el abdomen y los genitales le dijo "Vamos a levantarlo Don Sebastián Amaral y en ese momento él inició un movimiento para sentarse, creo yo y giró . . . inició un movimiento, giró sobre sí mismo y se fue por el lado izquierda de la mesa . . . y cayó al suelo"; que "Yo estaba pegado a la mesa . . . corrí al otro lado. El estaba en el piso. Lo viré boca arriba. Le pregunté cómo estaba y me contestó 'me mareé'. Me dijo esto clarito 'y me caí' ". Al preguntársele que si estaba al lado del paciente en la camilla por qué no lo agarró antes de que se cayese, contestó que "No lo pude agarrar. Se fue inmediatamente. Me sorprendió el movimiento de él y se fue al otro lado". El juez de instancia entonces añadió:

"Yo tengo una idea de cómo sucedió, porque me he sentado varias veces en la camilla ésa, no con el doctor, pero con otro doctor. Claro, cuando uno está acostado, se incorpora y se sienta, viene el médico y baja la parte de alante para que uno se baje. Pero en este caso no pasó eso; sino, de acuerdo con la declaración del doctor, él no llegó a incorporarse, sino que hizo un movimiento, al llegar a hacer el movimiento se cayó. Eso es lo que dice el doctor."

Luego el Dr. Fortuño testificó que antes de la caída no notó síntomas de mareo en el paciente y que "no había ninguna indicación de que él tuviese pérdida de balance y equilibrio."

Lo expuesto es un resumen de la prueba testifical con respecto al accidente en sí. A continuación resumimos la prueba sobre la relación causal entre la lesión sufrida por el recurrente con motivo de su caída en el consultorio del Dr. Fortuño y el hecho de que finalmente perdió la visión de su ojo derecho. Cf. *Concepción Guzmán* v. *A.F.F.*, 92 D.P.R. 488 (1965).

Testificó el Dr. Maestre que volvió a ver al señor Amaral el mismo día 23 de febrero de 1962, después que a éste le suturaron la herida de 3 ó 4 pulgadas que sufrió en la frente sobre el ojo derecho recién operado de desprendimiento de retina. Dijo que le examinó ese ojo y encontró que se

desarrolló un coágulo de sangre en el mismo debido al golpe sufrido por el señor Amaral en el referido accidente; que el coágulo fue de origen traumático; que tardó en absorberse; que el ojo se puso más turbio y al examinarlo varias veces en su oficina, más tarde, notó que la retina estaba despegada. Preguntado sobre la causa de esta situación contestó que "en cuanto a eso, trauma es un agravante de todo desprendimiento de retina; que luego del accidente apenas veía luz; "si le taparan el ojo izquierdo, con ese ojo derecho no podía hacer nada, no podía ni andar solo." Al testificar que el trauma fue un agravante de esa falta de visión dijo el Dr. Maestre que "El trauma está en la literatura médica oftalmológica como uno de los primeros agravantes de desprendimiento de retina, bien sea golpe o contusión, o golpe al mismo ojo, etc."; que antes del accidente este doctor se sentía optimista con respecto al resultado de la operación de retina pero después del mismo se tornó pesimista; que la lesión producida por el accidente en cuestión es lo que determinó la variación en su criterio. En contrainterrogatorio se le preguntó si podía decir con certeza razonable que el trauma que él vio en el ojo derecho del paciente fue la causa directa de que la operación de retina no fuera satisfactoria. Contestó que todo trauma en sí es un agravante de que la retina se desprenda; que con motivo de la operación el ojo se veía más claro pero que después del accidente lo notó más nublado.

El juez de instancia concluyó que el señor Amaral tuvo un desprendimiento de la retina del ojo *izquierdo*, que esta situación le sobrevino como resultado de patología degenerativa. La relación de la prueba que hemos hecho demuestra que estas conclusiones no son correctas. Tampoco es correcta la conclusión de que la operación de retina efectuada en el recurrente sólo tenía 40% de probabilidades de éxito. El Dr. Maestre testificó que tenía un 60% de probabilidades de éxito. Por último, se concluyó que la prueba pericial no pudo demostrar que la caída sufrida por el señor Amaral en el

consultorio del recurrido tuviera efecto en el fracaso de la operación y que la caída no se debió a negligencia alguna por parte del Dr. Fortuño ya que el señor Amaral podía valerse por sí mismo para incorporarse a la mesa de examen.

El recurrente apunta que las conclusiones de hecho del tribunal de instancia resultan ser contrarias a la prueba y que dicho tribunal incidió al interpretar el Art. 1802 del Código Civil en forma que exime a un médico que presta servicios profesionales en su consultorio de cumplir con las normas generales de cuidado para con sus pacientes.

Consideradas todas las circunstancias del caso, concluimos que el Dr. Fortuño no ejerció el cuidado, la diligencia y la atención razonable en su consultorio que el caso del señor Amaral requería. Cf. *Ortiz Fuentes* v. *Presbyterian Hospital*, 83 D.P.R. 308 (1961). La actuación del Dr. Fortuño en su consultorio con respecto al señor Amaral no se ajustó a las normas de procedimiento que debían seguirse en casos como el del paciente en cuestión, normas que el Dr. Maestre explicó en su testimonio y que repetimos a continuación. *Sáez* v. *Municipio de Ponce*, 84 D.P.R. 535, 541 (1962); *Rivera* v. *Dunscombe*, 73 D.P.R. 819, 838 (1952); Allan H. McCoid, *The Care Required of Medical Practitioners*, 12 Vand. L. Rev. 549, 613 (1958–59). En primer lugar, el Dr. Fortuño sabía de la operación de desprendimiento de retina que días antes había sufrido el señor Amaral. No tan sólo estaba familiarizado con esa situación por haber tratado al señor Amaral cuando fue operado de la retina, sino que fue advertido del cuidado que debía ejercerse en casos de esa naturaleza por el Dr. Maestre, quien fue el cirujano que realizó la operación. Como profesional le es atribuible el conocimiento de que las personas de 70 años con problemas de retina requieren mucho cuidado pues la falta de visión puede afectar su equilibrio. El propio Dr. Maestre, no obstante la renuencia que indudablemente sentía al testificar en un caso en contra de un compañero de profesión, dijo que

cuando el señor Amaral fue a verlo, él lo ayudó a sentarse en la silla de examen que es un poco alta y que si "lo hubiera ido a examinar lo hubiera ayudado a acostar y se fuera a levantar lo hubiera atendido", norma de cuidado y prevención que contrasta marcadamente con la observada por el Dr. Fortuño en este caso. Éste no ayudó al paciente a desvestirse y, según el propio médico, tampoco a acostarse en la mesa de exámenes. Luego, al terminar su gestión profesional, se contentó con ordenar al paciente que se bajase de la mesa. Además, no es probable que el paciente al iniciar un movimiento en la mesa girase sobre sí mismo y se cayese por el lado de la mesa opuesto a aquél en que se encontraba el Dr. Fortuño, con tal rapidez que el facultativo que estaba parado junto a la mesa no tuviese oportunidad de agarrarlo y evitar su caída. Testificó el Dr. Fortuño que el señor Amaral le dijo que se mareó. Pero, como indicó el Dr. Maestre, tal pérdida de equilibrio es previsible en tales pacientes. Y el daño resultante de la caída también podía anticiparse y así se deduce de la prueba testifical. *Cruz Costales* v. *E.L.A.*, 89 D.P.R. 105 (1963); *Pabón Escabí* v. *Axtmayer*, 90 D.P.R. 20 (1964); *Ginés Meléndez* v. *Autoridad de Acueductos*, 86 D.P.R. 518 (1962); *Weber* v. *Mejías*, 85 D.P.R. 76 (1962).

En *Lugo Pérez* v. *Santo Asilo de Damas*, 89 D.P.R. 247 (1963), nos negamos a responsabilizar a un hospital por la muerte de una anciana, recluida allí para ser operada de catarata, muerte que fue ocasionada por una hemorragia cerebral sufrida al caerse de la cama la noche antes de la operación. En ese caso no se pudo determinar la causa de la caída. La paciente no había demostrado requerir cuidado especial alguno que aconsejara tomar medidas de precaución con respecto a ella fuera de las corrientes. Bajo circunstancias similares negamos responsabilidad en *Ramos Orengo* v. *La Capital*, 88 D.P.R. 315 (1963). En el caso ante nos, por el contrario, la condición del paciente, así como el hecho de que debido a su condición estaba afectado su

equilibrio, era conocido del Dr. Fortuño. El recurrido sabía que había que tener mucho cuidado con el tipo y condición del paciente debido al peligro de trauma.

Es más lógico y probable que si el señor Amaral sufrió un mareo o pérdida de equilibrio, no fue mientras se encontraba acostado, sino más bien al llegar a sentarse en la mesa de exámenes y tratar de bajar y que en ese momento el Dr. Fortuño no se encontraba junto a la mesa de exámenes, pues como no cuidó del paciente mientras éste se desvestía ni cuando se acostó en la mesa de exámenes, es de suponer que tampoco estuvo muy atento de él cuando le ordenó que se bajase de la referida mesa. Puede ser que el señor Amaral, al entrar al consultorio del Dr. Fortuño, no diera indicación previa de pérdida de balance y equilibrio y con motivo del examen que le hizo dicho médico éste lo encontrase en condiciones normales. Pero, a nuestro juicio, eso no excusa la ausencia del cuidado, atención y diligencia por parte del médico que el paciente requeriría por razón del padecimiento oftálmico de que sufría que lo hacía propenso a perder el equilibrio en cualquier momento, y del conocido peligro de que esa condición se agravase debido a cualquier trauma que el paciente sufriese en la región alrededor del órgano afectado.

No podemos convenir con el tribunal de instancia que la prueba "no pudo demostrar que la caída sufrida por el demandante en la sala de examen del doctor Fortuño tuviera efecto en el fracaso de la operación." Concluimos todo lo contrario; que la prueba demostró algo más que la mera posibilidad de que el trauma ocasionado en el órgano visual recién operado contribuyere sustancialmente a su final pérdida de visión y que este resultado final fue debido, con mayores probabilidades, al trauma de la caída que a su vez se debió al descuido del Dr. Fortuño. *Sáez*, supra, pág. 543. Es cierto que debido a una patología degenerativa, el ojo derecho del señor Amaral tenía la visión reducida en un 50%. El des-

prendimiento de retina que sufrió al caerse en el momento de sentarse en una silla la redujo al 5%. El Dr. Maestre declaró que con la operación se podía restablecer la visión por ese órgano al 50% de lo normal que era la que tenía antes de sufrir el desprendimiento de retina. A los 17 días de la operación el Dr. Maestre examinó el ojo operado y encontró que tenía percepción de luz, que estaba mejor que antes de ser operado. Testificó el señor Amaral que por ese ojo veía los movimientos de las manos del Dr. Maestre cuando le quitaba el vendaje.

El accidente en el consultorio del Dr. Fortuño ocurrió cuando aún no se podía determinar con certeza si la operación había sido exitosa. Pero todos los indicios hasta entonces señalaban que habría de serlo. Con motivo del accidente el señor Amaral sufrió una herida de 3 ó 4 pulgadas en la frente sobre el ojo recién operado que le produjo un coágulo en dicho órgano debido al golpe que sufrió al caerse de la mesa de exámenes. El Dr. Maestre testificó que el trauma así sufrido es uno de los primeros agravantes de todo desprendimiento de retina. Luego del accidente, este facultativo examinó el ojo afectado y lo encontró más turbio. Dijo que apenas veía luz. Pudo determinar que la retina estaba despegada; que "con ese ojo [el paciente] no podía hacer nada." Debido a la lesión sufrida por el señor Amaral en el referido accidente, el Dr. Maestre testificó que se tornó pesimista con respecto al éxito de la operación de retina.

Consideradas las circunstancias de la edad del recurrente, el hecho que la operación de retina sólo le podía restablecer un 50% de la visión en el ojo afectado y demás circunstancias del caso, estimamos los daños sufridos por el señor Amaral con motivo del accidente que ha dado lugar a esta causa en la suma de $8,000.

*Por lo tanto, revocaremos la sentencia dictada en este caso y en su lugar dictaremos otra condenando al recurrido Dr. Fortuño a pagar al recurrente $8,000 por concepto de los*

*daños y perjuicios que sufrió, más las costas y $800 de hono-*
*rarios de abogado.*

El Juez Asociado Señor Belaval disintió.