ÁNGEL MANUEL OLIVEROS, ETC., demandantes y recurrentes, v. ANTONIO ABRÉU, M.D. y DOCTOR'S CENTER, INC., demandados y recurridos.

*Número:* R-67-79      *Resuelto:* 9 de febrero de 1973

*Manuel Martín Maldonado,* abogados de los recurrentes; *Rafael A. González,* abogado de los recurridos.

EL JUEZ ASOCIADO SEÑOR RIGAU emitió la opinión del Tribunal.

I. *Los hechos.*

Motivó la demanda de daños y perjuicios en este caso la muerte de una niña de 7 años ocurrida de una a dos horas después de haber sido operada de las amígdalas. Son los demandantes sus padres y los demandados el médico que la operó y la clínica u hospital en donde se realizó la operación y en donde estaba recluida la niña al momento de su muerte.

El tribunal de instancia concluyó que el cirujano no incurrió en mala práctica; que ni éste ni la clínica incurrieron en negligencia; y desestimó la demanda. En sus conclusiones el tribunal expresó que la atención que viene obligado a dar un médico a su paciente es la que se presta por los médicos en la comunidad; que se presume que el médico utilizó y administró el tratamiento adecuado; que el hecho de la muerte no crea presunción de negligencia; que la presunción que existe a favor del médico no fue refutada por prueba; que las circunstancias del caso no justifican la aplicación de la doctrina de *res ipsa loquitur;* y adoptó la explicación de los demandados de que la niña murió de un arresto cardíaco que se convirtió en un paro cardíaco.

La opinión del tribunal de instancia, tomada en su conjunto, tiene el estilo de una opinión solicitada al abogado de la parte vencedora en el juicio y firmada por el juez. Expresa la opinión en sus determinaciones de hechos probados que el Dr. Pedro Blanco Lugo es uno de los demandados, lo cual no es correcto. Al mencionar la operación expresa que la misma "resultó un éxito," lo cual es controvertible. Aunque no es impropio ni vemos nada malo en la práctica de solicitar del abogado de la parte vencedora que prepare un borrador de opinión, ya anteriormente hemos advertido de la necesidad de que esos borradores sean examinados con sumo cuidado por el

juez antes de ser firmados para expurgarlos de errores, exageraciones o expresiones que vayan más allá de la estricta justicia que quiere hacer el magistrado. Véanse nuestras expresiones sobre el particular en *Felipa Rivera* v. *Alfredo Rivera*, R-67-57 Sentencia de 27 de octubre de 1967 y en *Malavé* v. *Hosp. de la Concepción*, 100 D.P.R. 55 (1971).

Los hechos conocidos son los siguientes. Decimos "conocidos" porque como no se hizo autopsia, nunca se sabrá con seguridad cuál fue la verdadera causa de la muerte. La niña Sonia Oliveros fue admitida en la clínica Doctor's Center de Manatí, Puerto Rico, el martes 23 de junio de 1964 a las 6 de la mañana. El cirujano que la operó no la vio el día anterior ni ese día hasta el momento en que fue llevada a la sala de operaciones. Hay controversia sobre si se le hicieron o no los exámenes preoperatorios de rigor. Se sabe que no se le hicieron ni el día antes de la operación, ni mientras la niña estuvo en su habitación en la clínica.

El Dr. Pedro Blanco Lugo, quien administró la anestesia, declaró que en la sala de operaciones él le hizo a la niña un "examen general del sistema cardio vasculatorio," con resultado normal. El Dr. Abréu, el cirujano demandado, declaró que antes de la operación, se le hizo a la paciente "el chequeo ante-operatorio." Al preguntársele que qué era eso, contestó que era un examen general que consistía en examen de los oídos, la garganta, la nariz, el pecho, los pulmones, el corazón, el vientre y además un examen de la hemoglobina y del tiempo de coagulación de la sangre. También declaró que no era costumbre en esa clínica hacer esos exámenes preoperatorios en la sala de operaciones; que éste fue un caso excepcional.

Por otro lado, la enfermera Amparo Valdés Pagán, quien fue la que estuvo de servicio en la sala de operaciones, declaró sobre ese particular en el contrainterrogatorio de la forma siguiente:

"P. Tan pronto llegó a la sala de operaciones qué se hizo con la nena?

R. La acostamos.

P. No habló con la nena?

R. Siempre uno le dice algo. El doctor Blanco, recuerdo que habló con la nena también, cuando se le dio la anestesia, cosa que la nena se sintiera tranquila.

P. Ella llegó de su habitación y usted habló con ella?

R. Yo le hablé a ella.

P. La acostaron?

R. Sí, señor.

P. Inmediatamente empezaron a darle anestesia?

R. El médico, el doctor Blanco. Pero recuerdo que fue el que le habló que estuviera tranquila, que era una cosita, cosa que la nena cogiera confianza.

P. Está segura que no pasó nada más?

R. Nada más.

P. Llegó la nena, la acostaron y hablaron con ella y empezaron a darle la anestesia?

R. Sí, señor."

A este asunto de los exámenes preoperatorios hemos de regresar cuando describamos los récords médicos que constan en evidencia.

Una vez operada, la niña fue llevada a su cuarto por el cirujano y acostada, según la declaración de éste, boca abajo, con una almohada debajo del vientre y la cabeza presionada hacia uno de los lados para que pudiese respirar y tuviese libre acceso de aire por boca y nariz. En el juicio el cirujano declaró que luego de la operación cargó a la niña en sus brazos de la sala de operaciones a su cuarto. En un interrogatorio, admitido en evidencia, había declarado, también bajo juramento, que la niña fue llevada a su cuarto en una camilla. Esta contradicción es rara, aunque aparentemente no tiene relación con las cuestiones centrales del caso.

La niña fue operada a las 8:30 a.m. La operación duró, declaró el cirujano que la hizo, unos 15 ó 20 minutos. La niña fue devuelta a su cuarto como a las 8:50 ó 9:00 a.m. Allí se dejó con su madre, quien estaba en la habitación. Le explicaron a ella y a la enfermera práctica Ocasio, la del piso, cómo

debía permanecer acostada la niña para que pudiese respirar. Quedó así la niña al cuidado inmediato de su madre y de la enfermera del piso.

En el interrogatorio directo el cirujano declaró que luego de la operación se quedó en la clínica durante "más o menos media hora" y como todo seguía bien se marchó a su oficina en el pueblo, dejando la paciente a cargo de la enfermera y del doctor Guillermo Enrique Meléndez, quién estaba de turno; pero en el contrainterrogatorio dijo que estuvo en la clínica como de tres cuartos a una hora antes de irse para el pueblo. Al mencionar esta segunda contradicción, aunque la misma por sí sola no tiene suficiente importancia para determinar nada, no deja de preocuparnos la flexibilidad con que el doctor maneja los hechos.

Asumiendo que el cirujano se marchase de la clínica media hora después de dejar a la niña en su cuarto y asumiendo que como tres cuartos de hora más tarde, según él declaró, lo llamaron por teléfono debido a la emergencia, podremos presumir que ésta ocurrió como a las 10:15 a.m.

Fue entonces que la enfermera Ocasio avisó a la enfermera Amparo Valdés Pagán que la niña "se había puesto mala." Declaró la enfermera Valdés que fue corriendo a la habitación de la paciente y notó que ésta "realmente estaba mala" porque "no estaba respirando." La niña estaba cianótica, esto es, de un color azuloso debido a insuficiencia o falta de oxígeno en la sangre. La enfermera Valdés llamó enseguida al Dr. Meléndez quien vino y comenzó hacer esfuerzos por salvar a la paciente. Se trajo el equipo de emergencia, el cual se describe como la máquina de succión, el tanque de oxígeno y el resucitador. Se avisó al Dr. Abréu quien llegó y también vino el Dr. Blanco. Ambos se encontraban en su oficina en el pueblo cuando los llamaron. A pesar de los esfuerzos hechos, la paciente no volvió en sí y falleció.

Antes de terminar esta relación de hechos es necesario añadir que las partes estipularon que de haber declarado la

madre de la niña, ésta hubiese declarado que había visto al Dr. Abréu un mes antes del día de la operación; que no lo vio el día antes de la operación; y que de habérsele indicado que recluyera a la niña en el hospital el día antes a la operación ella y su esposo lo hubiesen hecho, pues, no tenían ningún reparo ni inconveniente en hacerlo.

II. *Los récords médicos.*

Una de las cuestiones controvertibles en este caso, como dijimos antes, es si a la niña se le hicieron o no los exámenes preoperatorios debidos, los cuales tienen el propósito de informar a los médicos si el paciente puede ser sometido a anestesia general y si puede ser operado. Otra de dichas cuestiones controvertibles es si en este caso el hospital demandado llevó los récords médicos completos y verídicos que la ley ordena llevar.

Constan en evidencia fotocopias de unos récords. Son unos formularios, impresos unos en español y otros en inglés, y contienen notas manuscritas.

El "Récord de Admisión y Resumen" contiene el nombre de Sonia Oliveros Rodríguez e información general suya, como su edad, fecha de nacimiento, lugar de nacimiento, etc. En el blanco que designa el médico que atiende a la paciente dice "Dr. Abréu." En el blanco correspondiente a fecha de admisión dice "VI-22-64," lo cual obviamente quiere decir 22 de junio de 1964. Eso es un error, pues fue comprobado y admitido por las partes que la niña fue ingresada al hospital el día 23 de dicho mes y año.

El segundo formulario, titulado "Informes de Laboratorio" tiene el nombre de Sonia Oliveros y el resultado de un examen de la sangre. Tiene la siguiente información: tiempo de coagulación 5 minutos; tiempo de sangría un minuto 45 segundos; hemoglobina 82%. Tiene fecha de 23 de junio de 1964. El tercer formulario, titulado "Nurses Records of Treatments and Symptoms," en el encasillado que dice fecha y hora, no aparece la fecha; sólo aparece la hora de 6:00 A.M. Tiene el

nombre de Sonia Oliveros y una nota que dice que la paciente ingresó al hospital por orden del Dr. Abréu para operación de amígdalas temprano en la mañana. Está firmada por la enfermera Maisonet.

El formulario titulado "Notas Clínicas" tiene el nombre de Sonia Oliveros y tiene dos partidas o notas. La primera tiene fecha de *22* de junio de 1964, a las 11:00 P.M. y dice, en lo pertinente, "Child admitted for tonsillectomy tomorrow." La segunda partida o nota tiene fecha de *23* de junio del mismo año, a las 11:00 A.M. y dice "Called to see patient who is cyanotic and in very poor condition. No vital signs present. Cardiac arrest. Declared dead." Aparece firmada con un signo ilegible. Aunque esa hoja que acabamos de describir en el blanco correspondiente al nombre del paciente dice Sonia Oliveros, esa primera nota fechada a 22 de junio es incorrecta porque, como sabemos, Sonia no estaba en el hospital, ni fue admitida al mismo, ese día.

El próximo formulario se titula "Récord de Historial, Examen Físico y Cirugía." Dicho formulario contiene dos columnas verticales de aproximadamente media página cada una y un espacio horizontal al pie de la hoja. Al pie de cada columna hay blancos para la fecha y para la firma de un médico. La primera columna contiene notas sobre Historial y Examen Físico y aparte de señalar la tonsilitis la demás información es normal en unos casos y negativa en otros. Esa primera columna está fechada al pie a *22* de junio de 1964 y está firmada por un médico. La segunda columna del formulario se titula "Informe de Operación." Se anota allí el diagnóstico de tonsilitis; se dice que el cirujano es el Dr. Abréu; que el asistente es el Dr. Blanco y que el anestesista es el Dr. Meléndez. Otro error, pues el anestesista en la operación de Sonia fue el Dr. Blanco. Dice que la operación empezó a las 8:45 A.M. y terminó a las 9:10 A.M. (estas horas tampoco concuerdan con las que aparecen en la transcripción de evidencia); que la condición post operatoria es buena; y que no

hubo hemorragia. Esta segunda columna está fechada a 23 de junio de 1964 y parece firmada por el Dr. Abréu pero al lado de dicho nombre hay unas iniciales ilegibles, lo cual parece indicar que otra persona escribió allí el nombre del Dr. Abréu. En la parte inferior del formulario se dice que la fecha de admisión del paciente fue el 22 de junio de 1964. Al final de esa hoja, en su margen inferior tiene la fecha de 23 de junio; se anota allí que el paciente murió y tiene la firma del Dr. Pedro Blanco Lugo.

Del examen de ese formulario (Récord de Historial, Examen Físico y Cirugía) que los demandados han presentado como correspondiente a Sonia Oliveros y de lo que surgió durante el juicio cuando se discutieron esos récords, estamos plenamente convencidos que ese Récord, en lo que a las dos columnas antes mencionadas se refiere (Historial, Examen Físico e Informe de Operación), no es el de Sonia Oliveros. En ningún sitio tiene su nombre. Los datos, como hemos señalado, no concuerdan con los de la operación de Sonia. Dicho récord de historial y de examen físico sin duda corresponde a otro paciente—un niño que ingresó en ese hospital a las 11:00 P.M. el día 22 de junio y quien también fue operado de las amígdalas el día 23. (Véase la primera nota antes mencionada en el formulario titulado "Notas Clínicas".) Sin embargo, la nota que aparece al pie de ese formulario, hecha no el día 22 sino el día 23 y con una tinta distinta, sí se refiere a Sonia sin mencionarla por su nombre porque allí se anota que el paciente murió.

El formulario titulado "Ordenes Médicas" contiene también otro error, pero si posible, más grave. Este formulario tiene el nombre de Sonia Oliveros y en el encasillado que dice "Fecha Empezó" aparece una fecha que puede ser el 23 de junio o el 22 porque hay un número escrito a mano sobre el otro. Ahí se escribió el 2 sobre el 3 ó el 3 sobre el 2. La segunda nota en esa hoja tiene fecha del día 23 de junio. *Igual ocurre* en el formulario titulado "Graphic Chart." En el encasillado

para la fecha decía originalmente 6/23/64 pero sobre el 3 aparece sobrepuesto un 2 de manera que puede decir 22 ó 23 de junio. Este récord, como el anterior, han sido alterados.

III. *Reglamento de Hospitales.*

El Reglamento de Hospitales prescrito por el Secretario de Salud bajo autoridad de ley, 24 L.P.R.A. sec. 332a, dispone en lo pertinente, lo siguiente:

(a) Los hospitales llevarán récords completos y exactos de cada paciente, desde que ingresa hasta que se le da de alta. 24 R.&R.P.R. sec. 18–252(b). Como hemos podido ver de la anterior descripción de los récords médicos, en el caso de autos, esta disposición se incumplió.

(b) Inmediatamente después de la operación el cirujano anotará en el récord médico del paciente una descripción completa y exacta de la técnica de operación, de los hallazgos, indicando los órganos o tejidos extraídos o intervenidos y el diagnóstico operatorio. 24 R.&R.P.R. sec 18–116. Tampoco se cumplió con esta disposición. El informe de operación aunque tiene al pie el nombre del Dr. Abréu aparece escrito por una persona que puso sus iniciales las cuales son ilegibles.

(c) El récord del paciente debe incluir, entre otros datos, la fecha de ingreso. 24 R.&R.P.R. sec. 18–253(a). Como hemos indicado los récords en este caso no son verídicos sobre ese extremo.

(d) Los pacientes que estén bajo la influencia de anestesia general o intrarraquídea serán atendidos *constantemente* por una enfermera, hasta que hayan recobrado la conciencia o hayan pasado los efectos de la anestesia. 24 R.&R.P.R. sec. 18–146(d). Sonia fue operada a las 8:30 A.M., la operación duró 15 ó 20 minutos y a las 8:50 ó a las 9:00 A.M. fue depositada en su cama en su cuarto. Quedó al cuidado de su madre, quien estaba en la habitación, y de la enfermera Ocasio, quien estaba a cargo del piso. No nos parece claro como para tener un juicio firme sobre ello si Sonia fue dejada sola con su madre mientras estaba todavía bajo la influencia de la anestesia.

Sin embargo, el cortísimo período de tiempo entre la terminación de la operación y el momento en que se depositó en su cama levanta serias dudas sobre el particular.

(e) No se operará bajo anestesia general intrarraquídea, ni se administrará anestesia general, a menos que se le haya hecho al paciente un examen físico que incluya examen del pecho, para determinar la presencia de infección respiratoria o de enfermedad cardíaca y un análisis de orina con pruebas de albúmina y azúcar. El resultado de estos exámenes se anotará en la hoja clínica del paciente. 24 R.&R.P.R. sec. 18–146(c). Como hemos indicado antes, es controvertible si se le hicieron esos exámenes a Sonia, pues el "Récord de Historial, Examen Físico y Cirugía" que se presentó correspondía a otro paciente. El propio Dr. Blanco, en el juicio admitió la probabilidad de un error y explicó que ese mismo día se había operado de las amígdalas a un niño (el que había ingresado el día 22). El único informe de examen que parece genuino es el de tiempo de coagulación y sangría hecho el día 23, que antes mencionamos.

(f) Dispone la ley que creó el Instituto de Medicina Legal que toda persona que tuviere conocimiento de una muerte acaecida dentro de las 24 horas siguientes a la admisión de un paciente en un hospital o clínica, deberá informar inmediatamente a la policía o a un juez o fiscal, quienes requerirán los servicios del médico forense. El médico forense deberá investigar la causa de la muerte en esos casos. La persona que descuidare dar la información antes mencionada incurrirá en delito público. Ley Núm. 206 de 15 mayo 1943, según enmendada, 18 L.P.R.A. secs. 699 a la 701. Tampoco se cumplieron con las citadas disposiciones de la ley. Sonia falleció en la misma mañana en que fue admitida al hospital. No se hizo autopsia.

IV. *La Norma Mínima de Atención Médica.*

Es necesario y útil que se conozca la norma mínima de atención médica que es exigible hoy día en casos de mala

práctica profesional. También es necesario distinguir entre la norma aplicable a los médicos y la aplicable a los hospitales y clínicas.

En *Carrasquillo* v. *Am. Missionary Association*, 61 D.P.R. 867 (1943), un caso en que un niño recién nacido fue quemado con agua caliente en el hospital, se responsabilizó solidariamente al médico y al hospital. Allí se confirmó la conclusión del tribunal inferior en el sentido de que hubo negligencia de parte del médico y de parte de los empleados del. hospital. El caso se resolvió a base de negligencia y no se discutió cuál sería la norma mínima de atención médica exigible al facultativo. En *Roses* v. *Juliá*, 67 D.P.R. 518 (1947), un caso en que un enajenado mental se subió a la azotea de una clínica y se lanzó desde allí, lo cual le ocasionó la muerte, también se resolvió a base de negligencia de los empleados de la clínica y se confirmó la sentencia que imponía daños.

Fue en *Rivera* v. *Dunscombe*, 73 D.P.R. 819 (1952), que se discutió específicamente la cuestión de mala práctica profesional. El tribunal hizo una incursión en la jurisprudencia norteamericana y adoptó la norma tradicional llamada de la localidad o de la comunidad cuando dijo a la pág. 838 que "Un médico solo viene obligado a dar a su paciente aquella atención. médica que generalmente se emplea para casos similares por el resto de los médicos en la comunidad." Sin embargo, añadió a renglón seguido un pronunciamiento que no es absolutamente compatible con la manifestación anterior. Dijo el Tribunal: "Es responsable en daños y perjuicios sólo cuando ha actuado negligentemente, con descuido o falta de pericia. En este aspecto un caso de mala práctica no se distingue de un caso ordinario de daños y perjuicios basado en negligencia."

Precisamente una de las críticas que por años se le ha hecho a la antigua regla de la comunidad es que una aplicación lógica de la misma haría aceptable como buena una práctica médica pobre o negligente por el mero hecho de que ésa es la clase de atención médica que se presta en una comunidad

dada. Johnson, *"An Evaluation of Changes in the Medical Standard of Care,"* 23 Vand. L. Rev. 729 (1970). De manera que en *Rivera* v. *Dunscombe,* supra, para quitar del camino de nuestros tribunales de instancia y del nuestro propio esa trampa del conceptualismo jurídico, ampliamos la vieja regla de la comunidad añadiéndole el requisito de que el médico no haya actuado "negligentemente, con descuido o falta de pericia."

En otras jurisdicciones para salvar también el peligro que hemos mencionado—que se estableciese una práctica pobre en una comunidad y que la misma se convirtiese por ello en la norma legalmente aceptable—se amplió la vieja norma sustituyendo "la comunidad" por el concepto de "esa o comunidades similares." *Michael* v. *Roberts,* 23 A.2d 361 (1941) y casos citados en 18 *De Paul L. Rev.* 328, 332, escolio 14 (1968). La norma así ampliada, aunque no satisfactoria del todo, mejoró en algo la norma tradicional. En las jurisdicciones en que se hizo ese cambio ya una práctica médica inaceptable profesionalmente de una comunidad dada no sería la norma a seguirse por los tribunales, sino que el demandante podía demostrar al tribunal que en comunidades similares la atención médica era superior y era a la que él tenía derecho. Pero la norma así enmendada dejaba sobre el demandante la necesidad de probar qué constituía una comunidad similar y éste se encontraba con la renuencia de los facultativos a declarar como peritos en contra de médicos que practicaban en comunidades similares a la suya.

Dejando para más adelante lo relativo a la responsabilidad de los hospitales y clínicas, prosigamos con el examen de nuestros casos de mala práctica, en la medida en que es necesario hacerlo a los fines de esta opinión. Ya en *Sáez* v. *Municipio de Ponce,* 84 D.P.R. 535 (1962), reconocimos, a la pág. 542, escolio 5, que la norma de la comunidad, que habíamos adoptado en *Rivera* v. *Dunscombe,* supra, había evolucionado debido a los adelantos en los medios de comunicación y a las

mayores facilidades que ahora existen para los médicos mantenerse enterados de los últimos progresos de la ciencia médica. Citamos allí a esos efectos un extenso trabajo publicado en el año 1959 en *12 Vand. L. Rev. 549*. En la pág. 641 de ese tomo ya se tilda de *anacronismo* dicha regla de la comunidad. Por qué eso es así lo discutiremos brevemente más adelante.

Luego de *Guzmán* v. *Silén*, 86 D.P.R. 532 (1962), un caso de dentistas; de *Castro* v. *Municipio de Guánica*, 87 D.P.R. 725 (1963), en donde se demandó a un hospital por actos de una enfermera; de otros en los cuales también fue el hospital el demando—*Soc. de Gananciales, etc.* v. *Presbyterian Hosp.*, 88 D.P.R. 391 (1963); *Lugo Pérez* v. *Santo Asilo de Damas*, 89 D.P.R. 247 (1963)—y de *Amaral Amaral* v. *Fortuño*, 93 D.P.R. 834 (1966), en el cual encontramos que fue negligente el demandado al dejar caer al paciente, de 71 años de edad, de la mesa de exámenes del consultorio médico; en *Pérez* v. *E.L.A.*, 95 D.P.R. 745 (1968), nos encontramos frente a un caso preciso de mala práctica.

Conscientes nosotros de que una norma que ya era considerada anacrónica en el 1959—y que definitivamente lo era en el '68—no debía de servirnos más de brújula en estos casos, en *Pérez* v. *E.L.A.*, supra, le cambiamos el contenido a la misma sin apenas cambiarle el nombre. Allí dijimos, a la pág. 753:

"La práctica profesional de la comunidad, o prevaleciente en la comunidad, cuando ese término se usa como norma ("standard") contra la cual medir el cuidado ejercido y el tratamiento administrado en un caso específico, no quiere decir la práctica pobre sino la práctica *que llena las exigencias profesionales reconocidas, o sea, la práctica aceptable profesionalmente hablando,* en determinado lugar y tiempo." (Énfasis nuestro.)

En *Vda. de Torres* v. *Womble*, 99 D.P.R. 859 (1971), seguimos la nueva norma de *Pérez* v. *E.L.A.*, supra. V. las páginas 870 y 875 de ese tomo 99. Igualmente hicimos en *Rodríguez Retamar* v. *Maldonado*, 100 D.P.R. 662 (1972).

Pero fue en *Reyes* v. *Phoenix Assurance Co.*, 100 D.P.R. 871 (1972), en donde expresamos con mayor claridad la nueva norma. Allí dijimos a las págs. 876–877:

"Ya este Tribunal ha establecido que la práctica profesional de la comunidad, o prevaleciente en la comunidad, cuando ese término se usa como norma contra la cual medir el cuidado ejercido y el tratamiento administrado en un caso específico, no quiere decir la práctica pobre sino la práctica que llena las exigencias profesionales reconocidas, o sea, la práctica aceptable profesionalmente hablando."

Antes de seguir adelante, en la formulación de la norma mínima de atención médica que vamos a adoptar en esta jurisdicción, debemos siquiera mencionar por qué abandonamos la norma de la comunidad, con o sin cualificaciones o enmiendas. Los autores y los tribunales de las jurisdicciones norteamericanas atribuyen el origen de esta norma al caso de *Small* v. *Howard*, un caso de Massachusetts, que ya tiene un siglo de decidido.[1] Como hemos dicho, la norma original establecía que los médicos venían obligados a dar solamente la atención médica que usualmente se daba en casos similares por los demás médicos en la comunidad. Cuando se decidió ese caso no existían en los Estados Unidos carreteras asfaltadas, ni automóviles, ni aviones, ni radio, ni televisión. En esas circunstancias se juzgó que no era justo exigirle los mismos conocimientos a un médico de una zona rural o semirural, con escasos e infrecuentes contactos con la ciudad, que a un médico de las grandes ciudades del este del país. V. *Brune* v. *Belinkoff*, 235 N.E.2d 793, 796 (1968). Desde luego, ya esas circunstancias han cambiado radicalmente. Los medios de transportación y de comunicación de hoy no hace falta describirlos. Los médicos, como otros profesionales, tienen hoy día amplias oportunidades de conocer los adelantos de la ciencia-arte que profesan a través de revistas profesionales, de reuniones,

---

[1] 128 Mass. 131 (1880). Véase *Brune* v. *Belinkoff*, 235 N.E.2d 793, 795 (1968).

conferencias, cursos, etc. Ante esa realidad ya no se justifica aceptar una práctica médica inferior cuando la práctica general es de buena a excelente. Escribiendo en 1964, el Profesor Prosser calificó de muy estrecha la norma de la comunidad. (²)

Autores y tribunales también han señalado que a los demandantes con demasiada frecuencia se les hace muy difícil o imposible conseguir que médicos sirvan de peritos en casos de mala práctica contra otros médicos. Prosser obra citada, pág. 167 y escolio 45. Véase *Douglas* v. *Bussabarger*, 438 P.2d 829, 831–832 y su escolio 1 (1968) ; y *Hundley* v. *Martínez*, 158 S.E.2d 159, 167 *in fine* (1967).

En vista de los medios modernos de transportación y comunicación y de las consideraciones antes mencionadas, la jurisprudencia norteamericana más progresiva está abandonando las antiguas normas de la comunidad y de comunidades similares.

Los tres citados casos de *Brune* v. *Belinkoff, Douglas* v. *Bussabarger* y *Hundley* v. *Martínez*, son claro ejemplo de ello. Dichos casos son considerados hoy casos normativos en esta materia.

El primero de esos casos trata de un oculista que realizó una operación de cataratas en forma negligente o con tal grado de impericia que le ocasionó daño considerable y permanente en el ojo al paciente. Se planteó como defensa la norma de la comunidad. El tribunal la rechazó aduciendo los razonamientos antes dichos—la transformación ocurrida en el último siglo en los medios de comunicación y transportación—y expresó que debido a que son comunes a todas las regiones del país los standards éticos de la profesión médica, a que es ubicua la información médica entre los miembros de esa profesión y a que el currículo de las escuelas de medicina es uniforme, existe de hecho una sola comunidad médica en todo el país. V. 158 S.E.2d a la pág. 167. A tenor con esa conclusión, el tribunal admitió el testimonio de un oculista de la

---

(²) Prosser, *On Torts*, 3ra. ed. (1964), págs. 166–167.

ciudad de Nueva York, quién declaró como perito del demandante aun cuando los hechos ocurrieron en Charleston, West Virginia.

En *Douglas* v. *Bussabarger*, supra, el tribunal rechazó la anacrónica norma de la comunidad. (³) Luego de una amplia discusión del asunto expresó que se ha confirmado lo que ya era bastante obvio; que actualmente no hay ninguna razón para seguir aplicando la norma de la comunidad. V. 438 P.2d a la pág. 838 *ab initio*.

En este caso el paciente fue operado de una úlcera. Se le aplicó anestesia intrarraquídea. El paciente quedó prácticamente paralítico de la cintura para abajo. Luego de una discusión de los hechos, que no es necesario aquí relatar, el tribunal concluyó que hubo negligencia de parte del demandado. El tribunal comenta sobre la dificultad con que se encuentran los demandantes en estos casos para obtener peritos médicos que acepten ir a declarar como tales. Citando a otros autores hace referencia a lo que se ha llamado "la conspiración del silencio." Nosotros hemos hecho observaciones parecidas. Véase *Ramos Orengo* v. *La Capital*, 88 D.P.R. 315, a la pág. 329 (1963).

En *Brune* v. *Belinkoff*, supra, también se trata de una aplicación errónea de anestesia. Se administró una dosis excesiva de pontocaína. En este caso, también de Massachusetts como el de *Small* v. *Howard*, supra, ochenta y ocho años más tarde se concluye que la norma de la comunidad establecida en *Small* v. *Howard* "ya no se ajusta a las condiciones actuales." En este caso, como en el de *Douglas* v. *Bussabarger*, supra, se discute la citada norma, las razones que le dieron vida y las que hoy día hacen que la misma sea abandonada.

■ Ante esa situación de nuestra jurisprudencia y de la norteamericana nos corresponde, para la información y gobierno de las profesiones legal y médica, establecer la norma

---

(³) Opinión emitida por voz del Juez Presidente Robert C. Finley, del Tribunal Supremo del estado de Washington.

que debe observarse en esta jurisdicción. Desde luego, en el término profesión legal antes utilizado incluimos también a los tribunales de instancia de Puerto Rico, que son a los que corresponde fallar estos casos antes de que los mismos lleguen a nosotros. Como se sabe, la jurisprudencia norteamericana antes mencionada no nos obliga, pero podemos utilizarla cuando la encontramos útil y persuasiva.[4] En este caso nos parecen persuasivas y bien razonadas las opiniones de los tres casos antes mencionados. (*Brune* v. *Belinkoff*, supra; *Douglas* v. *Bussabarger*, supra; y *Hundley* v. *Martínez*, supra.)

Desde luego, al fijar la norma debemos y queremos ser justos y razonables. No vamos a exigir requisitos o condiciones que hagan imposible la práctica de la medicina en Puerto Rico o que hagan económicamente prohibitivos los servicios médicos. Por otro lado, tenemos que poner nuestro derecho jurisprudencial a la altura de los tiempos. No podemos sancionar como buenas prácticas y actitudes inaceptables mediante la repetición de frases de hace un siglo que ya no tienen vigencia en estos días.

■ 1. ¿Cuál ha de ser, pues, la norma mínima de atención médica exigible legalmente en casos de mala práctica en Puerto Rico? Aquella que, reconociendo los modernos medios de comunicación y de enseñanza, establece que el nivel o calidad de esa atención debe ser la que llena las exigencias profesionales generalmente reconocidas por la profesión médica. Lo dicho en *Rivera* v. *Dunscombe*, 73 D.P.R. 819, a la pág. 838, en el sentido de que "un médico solo viene obligado a dar a sus pacientes aquella atención médica que general-

---

[4] *Vda. de Fornaris* v. *Amer. Surety Co. of N.Y.*, 93 D.P.R. 29, 47 (1966); *Jiménez y Salellas, Inc.* v. *Maryland Cas. Co.*, 92 D.P.R. 207 (1965); *Banchs* v. *Colón*, 89 D.P.R. 481 (1963); *Reyes* v. *Tribunal Superior*, 84 D.P.R. 29, 31–32 (1961); *Pueblo* v. *Matos*, 83 D.P.R. 335, 341 (1961); *Belaval* v. *Srio. de Hacienda*, 83 D.P.R. 251, 256 (1961); *Cía. Azucarera* v. *Tribunal Contribuciones*, 72 D.P.R. 909, 921 (1951); *Corretjer* v. *Tribunal de Distrito*, 72 D.P.R. 754, 760 (1951); *Pueblo* v. *Mantilla*, 71 D.P.R. 36, 51 (escolio 11) (1950); *Castro* v. *González*, 70 D.P.R. 887, 896 (1950); Wigmore, *On Evidence*, 3ra. ed. (1940), Vol. I, sec. 8a, pág. 245.

mente se emplea para casos similares por el resto de los médicos en la comunidad" queda revocado por ser incompatible con la norma que aquí adoptamos.

2. A tono con nuestro empeño de ser justos y razonables, encontramos necesario decir unas palabras sobre el margen de discreción profesional que debe tener y tiene el médico al diagnosticar y al tratar pacientes. Anteriormente nos hemos referido a la medicina como una "ciencia-arte." Lo hemos hecho adrede. La práctica de la medicina requiere, en el diagnóstico y en el tratamiento, que el facultativo llegue a juicios y tome decisiones. Hay en ese proceso un inevitable elemento subjetivo. También, la relación de médico y paciente es, o debe ser, única para ambos. Un médico tiene más de un paciente; posiblemente atiende en un mismo día a más de un paciente que sufren una misma enfermedad, pero la relación con cada uno es única porque trata con seres humanos y no con máquinas. La constitución física de cada ser humano es distinta, como lo es su sicología y su idiosincrasia.

Lo dicho demuestra, por un lado, la responsabilidad que asume el médico al diagnosticar y al tratar y, por otro, la necesidad de reconocer el elemento humano, subjetivo, no exacto, de su quehacer. Esa realidad nos lleva, a su vez, a reconocer que en el ejercicio de la medicina cabe el error de juicio honesto de parte del médico y aceptable por los tribunales. Claro, a los tribunales compete ver que la negligencia o la impericia no pase por error de juicio. Se ha dicho que en el *diagnóstico* el error de juicio es aceptable como defensa cuando está presente una de las siguientes circunstancias: (1) Cuando existe una duda razonable sobre la condición o enfermedad del paciente; (2) cuando las autoridades médicas reconocidas están divididas en cuanto a cuál debe ser el procedimiento de diagnóstico a seguirse; o (3) cuando el diagnóstico se hace después de un esfuerzo concienzudo del médico para enterarse de los síntomas y de la condición del paciente. Johnson, *"An Evaluation of Changes in the Medical*

*Standard of Care,"* 23 Vand. L. Rev. 729, 749 (1970) ; *Belk* v. *Schweizer,* 149 S.E.2d 565 (1966) ; *Moulton* v. *Huckleberry,* 46 P.2d 589 (1935) ; *Rivera* v. *E.L.A.,* 99 D.P.R. 890, 899–900 (1971).

Para un caso en que se aceptó como defensa el error de juicio en el diagnóstico, véase *Oftedal* v. *Calaway,* 135 P.2d 606 (1943). Para un caso en que no se aceptó esa defensa, también en el diagnóstico, véase *Moulton* v. *Huckleberry,* supra.

En cuanto al *tratamiento* se ha dicho que la defensa de error de juicio sólo debe aceptarse cuando las autoridades médicas reconocidas están en desacuerdo en cuanto al tratamiento que corresponde dar. Johnson, *Ibid,* 751. Para un caso en que se aceptó la defensa de error de juicio en el tratamiento, véase *Costa* v. *Regeants of University of California,* 254 P.2d 85 (1953). Como puede verse, al médico se le reconoce amplia discreción profesional en su trabajo; no es responsable de mala práctica cuando se enfrenta a una situación en la cual cabe duda educada y razonable sobre cuál debe ser el curso a seguir.

■ 3. En cuanto a los hospitales y clínicas reiteramos la norma que hemos expresado antes. El grado de cuidado que se les requiere es aquel que debe ejercer una persona prudente y razonable. *Soc. de Gananciales* v. *Presbyterian Hosp.,* 88 D.P.R. 391, 399 (1963) ; *Hernández* v. *La Capital,* 81 D.P.R. 1031, 1038 (1960).

Para casos en que hemos encontrado responsabilidad civil de parte de hospitales y clínicas, véanse *Cabrera* v. *Asoc. de Señoras Damas,* 96 D.P.R. 775 (1968) ; *Soc. de Gananciales* v. *Presbyterian Hosp.,* supra; *Ortiz Fuentes* v. *Presbyterian Hospital,* 83 D.P.R. 308 (1961) ; *Hernández* v. *La Capital,* supra; *Batista* v. *Clínica Juliá,* 71 D.P.R. 823 (1950) y *Roses* v. *Juliá,* 67 D.P.R. 518 (1947).

Para casos en que no hemos encontrado responsabilidad, véanse *Santiago* v. *Prof. Hospital, Inc.,* 97 D.P.R. 801

(1969) ; *Lugo Pérez* v. *Santo Asilo de Damas,* 89 D.P.R. 247 (1963) ; *Ramos Orengo* v. *La Capital,* 88 D.P.R. 315 (1963) y *Castro* v. *Municipio de Guánica,* 87 D.P.R. 725 (1963).

■ 4. La mala práctica usualmente se prueba mediante testimonio o prueba pericial, pero eso no tiene que ser siempre necesariamente así. El testimonio de los médicos peritos no es la única prueba que puede ser considerada por el juzgador de los hechos. *Douglas* v. *Bussabarger,* supra, a las págs. 832–833; *Byrom* v. *Eastern Dispensary,* 136 F.2d 278, 279 (1943) ; *"Malpractice and Medical Testimony,"* 77 Harv. L. Rev. 333, 335 (1963). Hay ocasiones en que en estos casos opera la regla de *res ipsa loquitur. Soc. de Gananciales* v. *Presbyterian Hosp.,* supra; *Pederson* v. *Dumouchel,* 431 P.2d 973, 979 (1967) ; *Ibarra* v. *Spangard,* 154 P.2d 687 (1944) ; *Douglas* v. *Bussabarger,* supra, a la pág. 833.

V. *Decisión.*

Vistos los hechos, un tanto extraordinarios de este caso, los récords médicos, las disposiciones pertinentes del Reglamento de Hospitales y las normas y principios jurídicos aplicables, nos resta fallar el mismo.

De un examen completo y general de la prueba puede concluirse que la niña murió a consecuencia de una, o de más de una, de las siguientes causas: ahogada por una hemorragia; ahogada por sus propias secreciones; a causa de la anestesia que se le administró; de un arresto cardíaco; o por otra causa desconocida. Como no se le hizo autopsia no se sabrá nunca exactamente qué le ocasionó la muerte.

■ Entendemos que el cirujano que practicó la operación incurrió en negligencia. Su responsabilidad para con el paciente no estaba limitada al acto preciso y concreto de extirpar las amígdalas. Antes de proceder con la operación era su deber cerciorarse de que se habían realizado todos los exámenes preoperatorios necesarios. Asimismo entendemos que dejó de cumplir con su deber al no atender adecuadamente a la paciente inmediatamente después de la operación, aban-

donando el hospital sin que ésta todavía hubiera recobrado el conocimiento.

En vista de la falta casi total de credibilidad que nos merecen los récords presentados en evidencia; en vista de que algunos de ellos fueron alterados; en vista de que la niña no estaba debidamente atendida cuando todavía estaba bajo los efectos de la anestesia, como manda el Reglamento de Hospitales, y cuando le sobrevino la gravedad; en vista de que el hospital no informó a las autoridades competentes sobre el deceso de la niña de manera que pudiese determinarse si se debía hacer o no la autopsia y por el contrario permitió que su cadáver fuese removido del hospital sin la autorización de dichas autoridades, lo cual hubiese aclarado la causa de la muerte; en vista de que el control total de la situación estaba en manos del hospital y ninguno en manos de la paciente o de los demandantes; éste es un caso en el cual corresponde hacer con respecto al hospital la inferencia de negligencia que hace aplicable la regla de *res ipsa loquitur*. Como explica Prosser, citando abundante jurisprudencia, para que esa regla opere no es necesario que el demandante elimine toda otra posibilidad y que pruebe su caso más allá de toda duda razonable, sino que basta con producir prueba que lleve a personas razonables a concluir que hubo negligencia de parte del demandado. Prosser, obra citada, pág. 222 y casos allí citados. Este es uno de esos casos en que es aplicable en derecho y en justicia dicha regla. *Soc. de Gananciales*, supra, a la pág. 411; *Pederson* v. *Dumouchel*, supra, a la pág. 979; *Douglas* v. *Bussabarger*, supra, a la pág. 833.

La demanda en este caso fue por $200,000.00. A tenor con lo anterior, se dictará sentencia revocando la del tribunal de instancia dictada en este caso y se dictará otra declarando la demanda con lugar y sentenciando a los demandados a pagar solidariamente a los demandantes la suma de $50,000.00 por concepto de daños y perjuicios, más las costas y $3,000.00 para honorarios de abogado.

Los Jueces Asociados, Señores Torres Rigual y Martín, no intervinieron.