# 2002 DTA 106

### TRIBUNAL DE CIRCUITO DE APELACIONES
### CIRCUITO REGIONAL I DE SAN JUAN
### PANEL III

FERNANDO DEL MONTE Y MARIA LOLA DEL MONTE POR SI Y EN REPRESENTACION DE LA SOCIEDAD DE GANANCIALES QUE TIENEN CONSTITUIDA
Demandantes-Apelados

v.

DR. RAFAEL RAMIREZ BRUNET POR SI Y EN REPRESENTACION DE LA SOCIEDAD DE GANANCIALES QUE TIENE CONSTITUIDA CON FULANA DE TAL; CONTINENTAL CASUALTY CO.
Demandados-Apelantes

Núm. KLAN-01-00493

San Juan, Puerto Rico, a 10 de junio de 2002

Panel integrado por su Presidente, el Juez Rafael Ortiz Carrión,
y los Jueces Antonio J. Negroni Cintrón y Jorge Segarra Olivero

Negroni Cintrón, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

El Dr. Rafael Ramírez Brunet, la Sociedad Legal de Gananciales que compone con Fulana de Tal, y su aseguradora, Continental Casualty Company ("*apelantes*"), instaron el recurso que nos ocupa para que revisemos la sentencia emitida el 16 de agosto de 2000 por el Tribunal de Primera Instancia, Sala Superior de San Juan. Mediante tal dictamen se les condenó a compensarle al Sr. Fernando del Monte, María del Monte y la Sociedad de Gananciales integradas por éstos ("*apelados*") los daños y perjuicios que les causó la mala práctica de la medicina del Dr. Ramírez Brunet al atender al Sr. Del Monte. Sometida la exposición narrativa de la prueba estipulada por las partes y el alegato de los apelados, estamos en condiciones de adjudicar los méritos del recurso.

# I

El Sr. Del Monte utilizaba habitualmente los servicios profesionales como dentista del Dr. Pedro Castro Pavía. A principios de 1986, el Dr. Castro Pavía refirió al Sr. Del Monte al Dr. Zequeira para un procedimiento de endodoncia, comúnmente conocido como "*root canal*" en su pieza dental número 18, el que el Dr. Zequeira realizó. Esa fue la primera vez que el Sr. Del Monte fue sometido a ese proceso.

El Sr. Del Monte continuó recibiendo atención dental del Dr. Castro Pavía. En abril de 1986, sin embargo, lo refirió al Dr. Rafael Ramírez Brunet para que le realizara un "*root canal*" en su pieza dental número 17, lo que éste hizo. En marzo de 1987, el Sr. Del Monte acudió a las oficinas del Dr. Ramírez Brunet nuevamente referido por el Dr. Castro Pavía para que le evaluara su pieza dental número 13 con el posible fin de que se le practicara otro "*root canal*". El paciente fue evaluado y el "*root canal*" se realizó en abril de 1987.

En junio de 1987, el Sr. Del Monte fue referido nuevamente al Dr. Ramírez Brunet para la evaluación y posible tratamiento endodontal de su pieza dental número 18. El Dr. Ramírez Brunet lo evaluó y realizó el mismo. A finales del año 1987 y sin referido médico, el Sr. Del Monte le solicitó al Dr. Ramírez Brunet que evaluara su pieza número 30 para otro "*root canal*". Este determinó su necesidad y la practicó a principios de 1988.

En octubre de 1996 y a iniciativa propia el Sr. Del Monte visitó la oficina del Dr. Ramírez Brunet, aquejándose de síntomas en su pieza número 32 similares a los que en otras ocasiones había padecido y requirieron "*root canal*". Luego de evaluar las radiografías que tomara del diente y realizar las correspondientes pruebas de vitalidad y movilidad, el Dr. Ramírez Brunet le diagnosticó necrosis pulpar (comúnmente conocido como "*nervio muerto*") con defecto periodontal en su raíz mesial. Al igual que en ocasiones anteriores, le indicó al Sr. Del Monte que se beneficiaría y era indicado realizarle un "*root canal*" en dicha pieza.

En esta visita se comenzó la primera etapa del "*root canal*" de la pieza, previa administración de anestesia en el área. Esta primera etapa del proceso concluyó sin eventualidad y se le dio cita de seguimiento para el 19 de octubre siguiente.

En esta segunda visita, se acomodó al Sr. Del Monte y se comenzó la administración de la anestesia requerida para el procedimiento. El Sr. Del Monte le hizo señas de dolor al Dr. Ramírez Brunet con su mano derecha. Este retiró **parcialmente** la misma, redirigió su inclinación y continuó administrando la anestesia. Al remover la aguja de la boca del Sr. Del Monte, éste le preguntó "*¿qué pasó?*", a lo que el Dr. Ramírez Brunet respondió que probablemente había tocado un nervio, pero que la sensación actual se le pasaría. El Dr. Ramírez Brunet abandonó el cuarto de tratamiento, luego de administrar la anestesia en lo que ella surtía efecto. Al regresar a la sala para continuar el tratamiento, se percató en su manejo del paciente que la anestesia administrada no surtió efecto. Determinó entonces que era necesario administrarle anestesia intra-pulpar o directamente al nervio del diente, para poder trabajar en él, lo que hizo y procedió a continuar con el tratamiento.

El Sr. Del Monte asistió el 24 de octubre de 1995 a una tercera visita de seguimiento donde se esperaba concluir el proceso. En esa ocasión informó que tenía dolor, adormecimiento y sensación de quemazón en la lengua. El Dr. Ramírez Brunet le explicó que estos síntomas se debían a que probablemente en la administración de la última anestesia se tocó el nervio lingual con la aguja; que estos síntomas persistirían de unas semanas a varios meses y que desaparecerían solos. Le prescribió vitaminas que ayudarían a la regeneración nerviosa y le concedió una nueva cita de seguimiento para el 31 de octubre. El demandante no acudió a esta cita, la cual pospuso para el 29 de noviembre siguiente. En esta ocasión, el Sr. Del Monte le informó al Dr. Ramírez Brunet que continuaba el adormecimiento de la lengua y sensaciones de "*shock*" eléctrico, a lo que el galeno le indicó que ello era señal de regeneración nerviosa.

En la próxima cita de seguimiento del 16 de diciembre, se le detectó al paciente un abceso en el área del molar afectado, el cual requirió ser drenado y una prescripción de antibióticos. Se le citó para seguimiento, a la

que nunca acudió, pues el Sr. Del Monte visitó la oficina del Dr. Víctor Fernández, endodoncista, quien completó el tratamiento de conducto radicular comenzado por el Dr. Ramírez Brunet. Como le narró los síntomas que le aquejaban en la lengua a raíz de la anestesia del 19 de octubre de 1995, el Dr. Fernández lo refirió al Dr. Josué Castillo, Cirujano Oral y Maxilofacial, para evaluación de la condición.

El Dr. Castillo recibió al Sr. Del Monte en enero de 1996. Este le narró la sintomatología que le aquejaba y el Dr. Castillo procedió a realizarle un examen clínico de las respuestas sensoriales de la lengua; el que reflejó pérdida de sensación en parte del lado derecho de la lengua. Le diagnosticó una lesión causada por aguja ("*needle injury*") al nervio lingual derecho, le anunció idéntico pronóstico y le prescribió idéntico tratamiento que el recomendado por el Dr. Ramírez Brunet, es decir, que estas lesiones usualmente duran de varias semanas a varios meses y que, por lo general, se regeneran espontáneamente con prescripción de vitaminas para área neural.

Así las cosas, los apelados instaron la demanda adjudicada. ■ Al cabo de varios meses de seguimiento sin demostrar mejoría, el Dr. Castillo le sugirió al Sr. Del Monte una evaluación para posible microcirugía del nervio lingual con el Dr. John M. Gregg, en el estado de Virginia. El demandante no acogió esa opción.

Continuaron los trámites del caso de epígrafe, entre los cuales figuró la confección de la opinión pericial del Dr. Reed Day. Adelantados los trámites del litigio y a solicitud de los apelantes, el Sr. Del Monte se sometió a una reevaluación de su condición con el Dr. Castillo. La misma reflejó una franca mejoría en el área de la lengua afectada.

Así las cosas, se celebró el juicio en su fondo, el cual culminó con la sentencia impugnada.

En su escrito, los apelantes le imputan al tribunal de instancia la comisión de los siguientes errores:

*"a. Concluir que el Dr. Ramírez Brunet sometió al Sr. Del Monte a un procedimiento endodontal ('root canal') sin obtener consentimiento alguno o consentimiento informado del paciente para el mismo.*

*b. Determinar que el consentimiento informado para tratamiento endodóntico al cual fue sometido el demandante requería que se le informara de la posibilidad de lesión al nervio lingual.*

*c. Determinar que durante el procedimiento de endodoncia que se le practicara al demandante el 19 de octubre de 1995, el Dr. Ramírez Brunet le causó negligentemente una lesión al nervio lingual del demandante.*

*d. Demostrar perjuicio y parcialidad en su apreciación de la prueba testifical desfilada al dar credibilidad a la versión del demandante sobre los hechos ocurridos el 19 de octubre de 1995, cuando dicha versión fue probada inverosímil."*

Los apelados comparecieron oportunamente. Alegaron, en primera instancia, que este Tribunal carecía de jurisdicción para entender en el recurso apelativo, por lo que el 10 de diciembre de 2001, le concedimos cinco (5) días a los apelantes para que mostraran causa por la cual no debíamos desestimar el recurso por falta de jurisdicción. También le ordenamos a la secretaria del tribunal de instancia que, en calidad de préstamo, nos refiriera el expediente original del caso.

Habiéndose cumplido con lo ordenado, estamos en condiciones de resolver.

**II**

Procede, en primer lugar, que dispongamos del planteamiento de falta de jurisdicción. Con tal fin, debemos exponer el accidentado trámite procesal que dio origen a la controversia jurisdiccional.

## A

El 16 de agosto de 2000, el tribunal de instancia emitió la sentencia apelada que fue notificada el 21 siguiente. Ocho (8) días después, el 29 de agosto del mismo año, los ahora apelados presentaron ante el tribunal apelado una **Solicitud de Reconsideración Parcial de la Sentencia**. El 31 siguiente, los ahora apelantes presentaron un escrito titulado **Moción Solicitando Determinaciones de Hechos y Conclusiones de Derecho Adicionales**. El 1 de septiembre de 2000 presentaron otra moción con algunas leves modificaciones en su introducción, solicitando las mismas determinaciones de hechos incluidas en la moción del 31 de agosto anterior. En esta nueva moción alegaron que tenían hasta el 2 de septiembre de 2000 para presentar la **Moción de Determinaciones de Hechos y Conclusiones de Derecho Adicionales**, debido a que el matasellos del sobre incluyendo la notificación de la sentencia indicaba la fecha de 23 de agosto de 2000.

El 6 de septiembre de 2000, el tribunal de instancia le concedió veinte (20) días a los apelantes para que se expresaran respecto a la **Moción de Reconsideración Parcial** presentada, mediante orden que fue notificada el 11 siguiente. El 8 de septiembre de 2000, los apelantes presentaron una **Solicitud de Reconsideración de Sentencia** y una **Moción Explicativa** y su **Oposición a Solicitud de Reconsideración Parcial de la Sentencia**. En la moción explicativa expusieron que tenían hasta el 7 de septiembre de 2000 para presentar su **Moción de Reconsideración**, debido a que la fecha de la notificación de la Sentencia era diferente a la del matasellos, pero que no lo hicieron en esa fecha, toda vez que el tribunal de instancia permaneció cerrado ese día por problemas con su sistema eléctrico.

Estando pendientes de adjudicación las anteriores mociones, el 19 de septiembre de 2000, los apelantes presentaron ante este Tribunal el recurso apelativo KLAN-00-01037.

El 25 de septiembre siguiente, los apelantes presentaron ante el tribunal de instancia una **Moción en Cumplimiento de Orden respecto a Moción de Reconsideración Parcial**. En la misma fecha, ese foro dictó una orden respecto a la **Moción Explicativa** de los apelantes, disponiendo que no podía proveer remedio alguno en ese momento, y una Resolución denegando la Moción de Reconsideración de los apelantes y la Oposición a la Solicitud de Reconsideración Parcial de la Sentencia. Ambos dictámenes fueron notificados el 28 de septiembre de 2000.

El 17 de octubre de 2000, el tribunal de instancia emitió dos órdenes respecto a las dos **Mociones de Determinaciones de Hechos Adicionales** pendientes ante él. Dispuso que no tenía nada que proveer por haberse apelado la sentencia ante este Tribunal. Ambas órdenes fueron notificadas el 20 siguiente.

Así el trámite ante el tribunal de instancia, el 11 de diciembre de 2000 y luego de que los apelados presentaran una **Moción de Desestimación** en el recurso KLAN-00-01037 pendiente ante nos, otro panel de este Tribunal emitió una Resolución en la que desestimó el recurso por falta de jurisdicción. Resolvió que la **Moción de Reconsideración Parcial** que presentaron los apelados fue acogida por el tribunal de instancia, que ello había interrumpido el término para apelar y convirtió el recurso en uno prematuro. Esta Resolución fue notificada el 13 de diciembre de 2000.

Devuelto el pleito al tribunal de origen, el 30 de enero de 2001, éste emitió una Resolución denegando la **Moción Solicitando Determinaciones de Hechos y Conclusiones de Derecho Adicionales** pendiente ante él y la **Moción de Reconsideración** presentada por los apelados, la que notificó el 14 de marzo siguiente, fecha en la que fue archivada en autos copia de la notificación de ese dictamen.

El 20 de marzo siguiente, los apelantes presentaron una moción alegando que las notificaciones recibidas no vinieron acompañadas de la resolución emitida. El 26 siguiente, los apelados presentaron una **Moción Solicitando Notificación de Resolución** informando lo mismo. El 24 de abril siguiente, el tribunal de instancia emitió una notificación enmendada de la resolución que emitió el 30 de enero de 2001.

En esas circunstancias, el 22 de mayo de 2001 se presentó ante nos un segundo escrito de apelación para que revisemos la sentencia que emitiera el tribunal de instancia el 16 de agosto de 2000.

El 21 de junio de 2001, el tribunal *a quo* emitió una orden disponiendo nuevamente la notificación de la resolución del 30 de enero de 2001 denegando la solicitud de determinaciones de hechos adicionales, la que fue notificada el 1 de agosto siguiente.

En atención del trámite antes descrito, los apelados levantaron en su alegato un planteamiento jurisdiccional. Alegan que la sentencia del 16 de agosto era final y firme debido a que cuando este Tribunal desestimó el recurso apelativo KLAN-00-01037 lo hizo en atención a que el mismo era prematuro, ya que el tribunal de instancia había acogido la **Moción de Reconsideración** presentada por los apelados y que no hizo mención alguna a la **Moción Solicitando Determinaciones de Hechos Adicionales**. También plantean, en la alternativa, que el nuevo recurso también es prematuro debido a que la notificación correcta fue la de 1 de agosto de 2001, ya que ésta incluyó, por primera vez, la advertencia de que a partir de esa notificación comenzaba a transcurrir el término apelativo.

Expuesto este trasfondo procesal, resolvemos la cuestión jurisdiccional.

**B**

Ciertamente, la notificación correcta de un dictamen es característica imprescindible del debido proceso judicial. *Rodríguez Mora v. García Lloréns*, opinión de 17 de diciembre de 1998, **98 J.T.S. 152**. Véase, además, *Jorge E. Martínez, Inc. v. Abijoe Realty Corp.*, opinión de 12 de mayo de 2000, **2000 J.T.S. 85**. Incumplir con el trámite de notificación provoca que los dictámenes sean inoperantes, que no surtan efecto y que no puedan ser ejecutados. *Falcón Padilla v. Maldonado Quirós*, 138 D.P.R. 983, 989-90 (1995). El debido proceso de ley requiere, como regla general, la notificación real y efectiva. *IM Winners, Inc. v. Junta de Subasta del Gobierno Municipal de Guayanilla y otros*, opinión de 17 de mayo de 2000, **2000 J.T.S. 86**, y el término jurisdiccional para apelar no puede comenzar a partir de una notificación sustancialmente defectuosa. *García v. Adm. de Derecho al Trabajo*, 108 D.P.R. 53, 57 (1978).

En lo pertinente a la cuestión que nos ocupa, también es correcto que cuando el término de treinta (30) días para apelar una sentencia establecido por la Regla 53.1 de Procedimiento Civil, 32 L.P.R.A. Ap. III, ha sido interrumpido por la oportuna y correcta presentación de una moción al amparo de la Regla 43.3 o la 47 ▆ de Procedimiento Civil, *ante*, el mismo se reanudará en ambos casos, cuando se archive en autos copia de la notificación de la resolución que las resuelva.

Ahora bien, la Regla 65.3 (a) de las de Procedimiento Civil, 32 L.P.R.A. Ap. III, dispone que:

*"Inmediatamente después de archivarse en autos copia de una orden o sentencia, el secretario notificará tal archivo a todas las partes que hubieren comparecido en el pleito en la forma preceptuada en la Regla 67. El depósito de la notificación en el correo será aviso suficiente a todos los fines para los cuales se requiera por estas reglas una notificación del archivo de una orden o sentencia."*

Por virtud de ésta, en Puerto Rico no se requiere que se le provea a las partes copia del dictamen cuya notificación se realiza mediante el envío a las partes de copia del documento o boleta en que se informa la fecha del archivo en los autos de copia del documento denominado *"Notificación"*. La notificación adecuada y efectiva que requiere nuestro sistema procesal civil es el envío del documento denominado *"Notificación"* mediante el cual se le comunica a las partes la fecha en que se archivó en autos copia de ese documento. Ese acto se realiza mediante el envío de un formulario denominado OAT-704 en los casos de sentencia y el OAT-750 en cuanto a resoluciones u órdenes. Véase, *Barletta v. Tribunal Superior*, 100 D.P.R. 690, 693 (1972). Repetimos, nuestro ordenamiento procesal no exige que al enviar el formulario OAT-704 se incluya copia íntegra de la sentencia emitida, como usualmente sucede con las resoluciones interlocutorias que emiten los tribunales, aunque ello es la

mejor práctica. *Id.*

## C

En la causa que nos ocupa, no está en controversia que el formulario OAT-750 enviado por correo el 14 de marzo de 2001 a las partes no indicó qué era lo que el tribunal de instancia había resuelto y, sobre todo, qué moción resolvía. Indicaba, además, que transcribía la resolución, pero no lo hizo y tampoco envió copia de la resolución emitida el 30 de enero de 2001 denegando la solicitud de determinaciones de hechos adicionales. Esta incertidumbre e imprecisión constituyó una sería omisión que tornó en defectuosa e inefectiva esa notificación, a los fines de que comenzara a decursar nuevamente el término para apelar que fue interrumpido, mediante la presentación de la moción solicitando determinaciones de hechos adicionales. No obstante, el 24 de abril, el tribunal de instancia le envió por correo a todas las partes otra notificación en el formulario OAT-750, con la que incluyó copia de la resolución del 30 de enero de 2001 e indicó la fecha en que se había archivado en autos copia de esa notificación. Aunque no era necesario que enviara la resolución, al hacerlo dejó ver sin duda cual era la moción que resolvía.

Por entender que la notificación del 4 de mayo de 2001 era defectuosa, las partes presentaron mociones solicitándole al tribunal que notificara nuevamente. El que se notificara correctamente era sumamente importante, ya que se estaba resolviendo la **Moción de Determinaciones de Hechos Adicionales** y la adjudicación de ésta y la notificación de la fecha del archivo en autos de copia de su notificación daba comienzo al término para acudir ante nos.

Ello así y toda vez que el tribunal de instancia, mediante notificación enmendada, notificó correctamente el 24 de abril de 2001 la resolución denegando la **Moción de Solicitud de Determinaciones de Hechos y Conclusiones de Derecho Adicionales**, el término de treinta (30) días para acudir ante este Tribunal mediante el recurso de apelación comenzó a contar desde ese día, fecha en que fue archivada en autos copia de la notificación. Por esta razón, los apelantes tenían hasta el 28 de mayo de 2001 para presentar su recurso apelativo ante este Tribunal. Al presentarlo el 22 de mayo siguiente, lo hicieron dentro del término jurisdiccional dispuesto en ley.

Por tal motivo, se deniega la moción de desestimación formulada por los apelados. Procede, pues, que adjudiquemos los méritos de la apelación.

## III

## A

Al discutir el primer error, los apelantes plantean que el tribunal de instancia ignoró otros principios fundamentales de la doctrina de consentimiento informado claramente aplicables a los hechos del caso de epígrafe, aunque aceptan que la normativa expuesta por ese Foro es correcta. Sostienen que, en el caso que nos ocupa y al aplicarse la totalidad de las normas referente al consentimiento informado en esta jurisdicción, es inescapable concluir que el Sr. Del Monte prestó consentimiento informado al tratamiento de endodoncia que recibiera el 19 de octubre de 1995 y que la determinación del tribunal de instancia al contrario es claramente errónea.

Basan su tesis en que el tratamiento de endodoncia en aquella ocasión practicado al Sr. Del Monte constituia el **quinto** tratamiento al que era sometido y el **cuarto** que le practicaba el Dr. Ramírez Brunet; que el Sr. Del Monte testificó, tanto en su deposición como en el juicio, que al momento de procurar los servicios del Dr. Ramírez Brunet para el tratamiento, lo hizo con *"total experiencia"* de lo que conllevaba un procedimiento de *"root canal"* y los riesgos del mismo; que anteriormente se le había administrado anestesia en la boca sin ninguna eventualidad, por lo que el Dr. Ramírez Brunet entendió que según los principios de previsibilidad de los riesgos desde el punto de vista del médico resultaba completamente imprevisible que en esa ocasión hubiese alguna complicación; que era la primera vez en 31 años que le laceraba el nervio lingual a algún paciente y, por último,

que no encontró necesario informarle al Sr. Del Monte sobre otras alternativas debido a que conforme a su juicio clínico y experiencia la misma era salvable.

En cuanto al segundo error, sostienen que el tribunal de instancia erró al concluir que un trauma al nervio lingual era un riesgo previsible que el médico debió haberle advertido al paciente antes de la administrarle un bloqueo mandibular, ya que, en su opinión, esta conclusión es contraria a todo el testimonio pericial desfilado en la vista en su fondo y a la literatura médica admitida como evidencia.

Sostienen que el tribunal de instancia ignoró que *todas las alternativas de tratamiento que podría recibir el Sr. Del Monte, razonables o no, conllevaban necesariamente la administración de anestesia mediante bloqueo mandibular;* que las únicas alternativas de tratamiento que tenía el Sr. Del Monte para la pieza afectada, conforme la evidencia por él propuesta, eran: (a) la extracción de la pieza, (b) el procedimiento de endodoncia que le fue practicado, y (c) la alternativa que propuso el perito de la parte demandante de romper el puente que se apoyaba en la pieza, extraer la pieza, someterlo a cirugía de implantación de hueso, y la preparación de un reemplazo removible de la pieza, y que todas estas alternativas propuestas conllevaban la administración del bloqueo mandibular que, de hecho, le fue practicado al paciente y a consecuencia del cual sufrió el trauma alegado en el nervio lingual. Finalmente, asevera que los apelados no demostraron que su consentimiento al tratamiento de endodoncia hubiese sido distinto de habérsele divulgado el riesgo de trauma al nervio lingual, ya que toda alternativa de tratamiento disponible conllevaba la administración de la misma anestesia.

Para disponer de estos errores, debemos exponer los principios doctrinales jurídicos relacionados con la impericia médica aplicables a la controversia.

### B

En armonía con la reiterada norma mínima de cuidado médico exigible legalmente en casos de impericia en Puerto Rico, se espera que un facultativo brinde a su paciente aquella atención médica que, a la luz de los modernos medios de comunicación y enseñanza y conforme al estado de conocimiento de la ciencia y la práctica prevaleciente de la medicina, satisfaga las exigencias generalmente reconocidas por la propia profesión médica. *Santiago Otero v. Méndez*, 135 D.P.R. 540 (1994); *Castro Ortiz v. Municipio*, 134 D.P.R. 783 (1994); *Pérez Torres v. Bladuell Ramos*, 120 D.P.R. 295 (1988); *Medina Santiago v. Vélez*, 120 D.P.R. 380 (1988); *Riley v. Rodríguez de Pacheco*, 119 D.P.R. 762 (1987); *Ríos Ruiz v. Mark*, 119 D.P.R. 816, 820 (1987); y *Oliveros v. Abréu*, 101 D.P.R. 209, 226 (1973).

Así pues, en casos de impericia médica como el que nos ocupa, el demandante tiene que presentar prueba sobre tales normas de conocimiento y cuidado médico, y demostrar que el demandado incumplió con las mismas. *Martí Méndez v. Abréu Feshold*, 143 D.P.R. 520 (1997); *Ramos, Escobales v. García, González*, 134 D.P.R. 969 (1993); *Medina Santiago v. Vélez, supra; Negrón v. Municipio de San Juan*, 107 D.P.R. 375 (1978); *Oliveros v. Abréu, supra.*

Conforme el Artículo 1802 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 5141, la parte demandante está, además, obligada a establecer, mediante preponderancia de prueba: (1) la realidad del daño sufrido, (2) la existencia de un acto negligente y, además, (3) el elemento de causalidad.

Según lo resuelto en *Sepúlveda de Arrieta v. Barreto Domínguez*, 137 D.P.R. 735 (1994), *"[e]n términos generales, el médico debe informar sobre el diagnóstico, la naturaleza de las alternativas de tratamiento (especialmente de aquel propuesto o recomendado por el médico), las probabilidades de éxito del tratamiento, los riesgos y beneficios de éstos, y la prognosis en caso de que la condición diagnosticada no sea tratada"*, *Id.* a la pág. 752, información que deberá estar matizada por lo establecido en la práctica prevaleciente de la medicina en el contexto del supuesto particular de cada caso. ■ Atendido este criterio, es responsabilidad del demandante establecer mediante testimonio pericial que: (1) un profesional médico razonable, siguiendo

criterios prevalecientes en la práctica de la profesión, situado en circunstancias similares, hubiera divulgado la información; y (2) que el demandado no cumplió ese criterio profesional prevaleciente. *Sepúlveda de Arrieta v. Barreto Domínguez, supra*, a la pág. 743.

Como la relación médico-paciente es una de naturaleza consensual, y el consentimiento del paciente es indispensable para autorizar al cirujano a practicar una operación en su cuerpo, una intervención quirúrgica como la que aquí nos ocupa, practicada sin tal consentimiento constituye un acto ilegal y torticero. *Rodríguez Crespo v. Hernández*, 121 D.P.R. 639 (1988); *Torres Pérez v. Hosp. Dr. Susoni, Inc.*, 95 D.P.R. 867 (1968); *Rojas v. Maldonado*, 68 D.P.R. 818 (1948). El derecho de todo paciente para decidir libremente qué debe hacerse con su cuerpo está protegido por los tribunales. *Sepúlveda Arrieta v. Barreto, supra.*

Como consecuencia lógica de lo anterior, el médico debe siempre obtener el consentimiento del paciente, o el de alguna persona legalmente autorizada para darlo por el paciente, en los casos de menores o incapacitados, antes de someterlo a un tratamiento o a una operación. Sólo se justifica la intervención quirúrgica en ausencia de consentimiento ante situaciones de emergencia o que ocasionen grave perjuicio al estado sicológico del paciente. *Rodríguez Crespo v. Hernández, supra,* a la pág. 663; *Rojas v. Maldonado, supra,* a la pág. 827.

El consentimiento del paciente debe ser uno razonablemente informado, luego de habérsele explicado al paciente la naturaleza del tratamiento recomendado. El médico tiene la obligación de divulgar al paciente los riesgos razonablemente previsibles, así como los beneficios de tratamientos y procedimientos invasivos del cuerpo humano y de otras alternativas disponibles. Debe además informar la prognosis en caso de que la condición diagnosticada no sea tratada, de manera que el paciente se encuentre en la mejor posición de tomar una decisión inteligente e ilustrada. *Sepúlveda Arrieta v. Barreto, supra; Rodríguez Crespo v. Hernández, supra.* Como lo que en ocasiones le presenta dificultad a los tribunales es el determinar cuánta información es la que el médico debe proveer al paciente para que la decisión de este último sea una inteligente y no viciada, se ha establecido que el alcance del deber de información está determinado por la práctica prevaleciente en la comunidad médica. *Sepúlveda Arrieta v. Barreto, supra.*

La hoja o formulario de consentimiento es una manera de perpetuar en forma escrita la voluntad del paciente, pero no debe entenderse que la misma siempre incluye todos los aspectos del consentimiento informado. La responsabilidad del médico excede el obtener una firma sin ofrecer información suficiente respecto a diagnóstico, intervención y prognosis. El médico es responsable de explicarle al paciente la naturaleza de la operación, los riesgos que acarrea, sus beneficios, los tratamientos alternos y las posibles consecuencias de no someterse al procedimiento. No sólo debe obtener la firma, sino que debe proveerle la información necesaria al paciente para que éste pueda prestar un consentimiento informado e inteligente antes de prestar la firma.

## C

Atendida la anterior normativa y luego de estudiar y analizar el expediente, incluyendo la transcripción oral, concluimos que no encontramos justificación para variar lo resuelto por el tribunal de instancia. Los apelados sostuvieron durante el juicio que el Dr. Ramírez Brunet nunca le informó al Sr. Del Monte respecto del procedimiento quirúrgico. El tribunal de instancia le creyó, aun cuando conocía que el Sr. Del Monte se había sometido a esta operación antes.

En el caso que nos ocupa, todos los peritos que testificaron en la vista en su fondo coincidieron con el hecho de que el sufrimiento de un trauma en el nervio lingual durante la administración de anestesia del tipo bloqueo mandibular es un riesgo inherente, aunque de rarísima ocurrencia en dicho procedimiento. Igualmente sostiene la evidencia documental admitida en este caso al respecto. A continuación detallamos varios de los artículos de literatura médica sometidos en evidencia e incluidos en el apéndice del presente que proveen información estadística sobre el suceso de daño permanente al traumatizar el nervio lingual durante la

administración de un bloqueo mandibular:

"* 'Incidence of Lingual Nerve Trauma and Postinjection Complications in Conventional Mandibular Block Anestesia'. Harn S.; Durham T.; J.A.D.A., Vol. 21, (1990). Provee una estadística de 8.99% de episodios traumáticos al nervio lingual durante la administración de bloqueos mandibulares. De éstos, el 51.92% se resuelven en menos de 24 horas, y solamente el 3.85% (del 8.99% original, o sea, 0.35% del total) exhiben síntomas durante más de un año. (Véase Apéndice 31, a la pág. 375.)

* 'Nerve Regeneration: Basic and Applied Aspects'. Donoff R.B.: Crit. Rev. Oral Biol. Med. 6 (1) 1995. Cita estadística de que el 0.6% de los traumas al nervio lingual exhibían síntomas después de un año. (Véase Apéndice 31, a la pág. 387.)

* 'Clinical Investigation into the Incidence of Direct Damage to the Lingual Nerve by Local Anestesia'. Drs. Kraft T.; Hickel R.; Journal of Cranio and Maxillofacial Surgery (1994). Provee estadística de que un 0.008% de que los traumas al nervio lingual exhiben síntomas luego de transcurrido un año." (Véase Apéndice 31, a la pág. 395.)

Del récord médico que fuera admitido en evidencia por estipulación de las partes se desprende que la hoja sobre Reglas y Consentimiento Informado para Tratamiento, en adición de no estar firmada ni por el Sr. Del Monte, ni por el Dr. Ramírez, no incluyó los detalles que le fueran informados al Sr. Del Monte sobre el tratamiento a realizarse; tampoco incluye las alternativas al mismo. Más bien lo que hace es detallar la forma de pago.

Según el testimonio del perito Dr. Reed Day, al que el tribunal le mereció entera credibilidad, al paciente se le debe informar por escrito del procedimiento, especificando cuál era la posibilidad de circunstancias imprevistas como por ejemplo el fallo en el procedimiento de "root canal", pérdida del diente o lesión al nervio lingual. También testificó que el hecho de que al paciente se le hubieren practicado previamente un "root canal" no liberaba al Dr. Ramírez Brunet de su obligación de obtener consentimiento informado, esto debido a que la prognosis de cada paciente es distinta. Obtener el consentimiento informado del paciente es la norma de cuidado establecida y reconocida, siendo la mejor práctica de la profesión.

Según surge del Manual notificado y publicado por el Colegio de Dentistas titulado "Risk Management Techniques for Endodontic Procedures" de 1989, y que fuera admitido como evidencia, es importante que previo al inicio del tratamiento se informe al paciente sobre los riesgos del tratamiento endodontal al que será sometido. Indica, además, que, como el procedimiento de "root canal" conlleva riesgos, se recomienda un consentimiento informado adecuado.

De la literatura médica presentada en evidencia surge, además, que la lesión a los nervios puede ocurrir durante el tratamiento, asunto que el propio Dr. Ramírez Brunet admitió en su testimonio. Esta destaca el posible daño al nervio lingual.

En fin, el daño al nervio lingual es una de las posibles consecuencias del tratamiento de "root canal" y existiendo otras alternativas, el Dr. Ramírez Brunet incumplió su deber de informarle al paciente al respecto. El que él entendiera que el tratamiento de "root canal" tuviera mejores posibilidades de éxito que otros tratamientos, no lo eximía de informarle sus riesgos al paciente. Como mencionáramos antes, la doctrina de consentimiento informado parte de la premisa de que el paciente debe conocer los riesgos del tratamiento y las alternativas disponibles para que el paciente pueda tomar una decisión sobre lo que debe hacerse con su cuerpo. Por tales razones, concluimos que el tribunal de instancia no incidió al resolver que el Dr. Ramírez Brunet incumplió con su obligación de informarle al paciente los riesgos a los que se enfrenta.

Ahora bien, en *Sepúlveda de Arrieta, supra*, el Tribunal Supremo de Puerto Rico aclaró que tanto en los Estados Unidos como en las jurisdicciones civilistas el mero incumplimiento del deber de informar al paciente no es suficiente para imponerle al médico la obligación de resarcir daños. Deben además cumplirse con dos condiciones: *"(1) que el paciente haya sufrido un daño, y (2) que sea causado por el incumplimiento del médico de su deber de informar. [Citas omitidas]. En otras palabras, debe ocurrir un daño y haber relación causal con la negligencia del médico"*. *Id.*, a la pág. 547.

Esto nos lleva a la discusión de los restantes dos errores señalados y relacionados con la apreciación de la evidencia que realizara el tribunal de instancia para determinar la negligencia del Dr. Ramírez Brunet y los daños sufridos por el Sr. Del Monte.

## IV

Ya que ambos cuestionan la apreciación de la prueba que realizara el tribunal de instancia, el tercer y cuarto error deben ser discutidos en conjunto.

Al discutir el tercer error, los apelantes sostienen, en síntesis, que la determinación de negligencia del tribunal de instancia fue contraria a toda la evidencia pericial desfilada, a la evidencia documental sometida y contraria a determinaciones jurisprudenciales del Tribunal Supremo de Puerto Rico. Mediante el cuarto error le imputa prejuicio y parcialidad al tribunal de instancia por haberle creído al Sr. Del Monte. Veamos.

## A

Ciertamente, es doctrina claramente establecida que los tribunales apelativos sólo intervendrán con las determinaciones de hechos y la adjudicación de credibilidad del Tribunal de Primera Instancia cuando se demuestre que éste actuó por pasión, prejuicio o error manifiesto. En asuntos de credibilidad se le concede deferencia a las determinaciones de hechos, la apreciación de la prueba y la adjudicación de credibilidad efectuada por el tribunal sentenciador. Es a dicho foro a quien corresponde aquilatar la prueba testifical ofrecida y dirimir la credibilidad, debido a que, ciertamente, los foros de primera instancia están en mejor posición para evaluar la prueba desfilada, pues tienen la oportunidad de observar y escuchar a los testigos. *Mercado v. Universidad Católica*, 143 D.P.R. 610, (1997); *Méndez v. Morales*, 142 D.P.R. 26 (1996).

A pesar de ello, esa norma no es infalible. Aunque el arbitrio del juzgador de hechos es respetable y merece deferencia, no es absoluto, y una apreciación errónea de la prueba no está inmune a la función revisora de este tribunal. Por ello, aunque haya evidencia que sostenga las conclusiones de hecho del tribunal sentenciador, si de un análisis de la totalidad de la evidencia el foro apelativo queda convencido de que son claramente erróneas, deberá intervenir con aquéllas. Ejemplo de ello es cuando las conclusiones están en conflicto con el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida. En tal caso deberán considerarse claramente erróneas. *Méndez v. Morales, supra*.

De otra parte, la norma de que un tribunal apelativo no debe alterar las determinaciones de hechos del tribunal sentenciador, no aplica cuando la evidencia consiste de deposiciones, estipulaciones escritas u orales, o de hechos incontrovertidos por las alegaciones o la prueba. Por esto, cuando consideran prueba documental, los tribunales apelativos o de revisión están en igual posición que la sala sentenciadora para hacer sus propias determinaciones y no pueden renunciar a ello sin afectar la efectividad de su función revisora. *Moreda Toledo v. Rosselli*, Op. de 3 de marzo de 2000, **2000 J.T.S. 69**. Más específicamente, cuando las determinaciones sobre impericia médica del tribunal *a quo* están fundamentadas en la prueba pericial y documental ofrecida, el foro apelativo está en igual posición para evaluarla y llegar a sus propias conclusiones. *Ríos Ruiz v. Mark*, 119 D.P. R. 816, 820 (1987); *Cruz v. Centro Médico de P.R.*, 113 D.P.R. 719 (1983); *Velázquez v. Ponce Asphalt*, 113 D. P.R. 39 (1982).

Finalmente, la responsabilidad civil extracontractual tiene como base jurídica, en nuestro ordenamiento, el

Artículo 1802 del Código Civil que establece, en lo pertinente, que *"el que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado"*. 31 L.P.R.A. sección 5141. De este articulado emana la responsabilidad civil por actos de mala práctica de la medicina, debidos a la impericia o negligencia de un facultativo. *Ortega v. Pou*, 135 D.P.R. 711, 714 (1994); *Santiago Otero v. Méndez*, 135 D.P.R. 540 (1994). Para establecer *prima facie* un caso de daños y perjuicios por negligencia o impericia médica, el demandante tiene: (1) que presentar prueba sobre las normas mínimas de conocimiento y cuidado médico aplicables a los generalistas o a los especialistas, (2) demostrar que el demandado incumplió con estas normas en el tratamiento del paciente, y (3) que esto fue la causa de la lesión sufrida por el paciente.

En otras palabras, **corresponde al demandante establecer, mediante prueba pericial, cuáles son los requisitos de cuidado y conocimiento científico requeridos por la profesión en el tratamiento de determinado tipo de pacientes.** Esa prueba deberá demostrar cuáles son las exigencias de toda la profesión a la luz de los conocimientos científicos disponibles, mediante los medios de comunicación y programas de educación continuada, así como las normas de consentimiento informado aplicables al caso y la razón por la cual el médico demandado no cumplió con las mismas. *Rodríguez Crespo v. Hernández, supra*, a la pág. 650; *Medina Santiago v. Vélez,* 120 D.P.R. 380, 385 (1988). Ello constituye la razón principal por lo cual la negligencia del médico no se presume.

A los fines de considerar la causa legal o causalidad productora de responsabilidad jurídica, en nuestro ordenamiento rige la teoría de la causalidad adecuada. Dicha teoría establece que no es causa toda condición sin la cual no se hubiera producido el resultado, sino la cual ordinariamente lo produce según la experiencia general. *Cárdenas Maxán v. Rodríguez Rodríguez,* 125 D.P.R. 702, 710 (1990); *Jiménez v. Peregrina Espinet,* 112 D.P.R. 700, 706 (1982); *Soc. de Gananciales v. Jerónimo Corp.,* 103 D.P.R. 127, 134 (1974).

En Puerto Rico, un médico está obligado a responder por los daños y perjuicios que cause, únicamente cuando actúa negligentemente, con descuido o con falta de pericia profesional. A esos efectos, es menester reconocer que en nuestro ordenamiento jurídico, las normas mínimas de cuidado, conocimiento y destrezas requeridas a los médicos, en casos de alegada mala práctica profesional, son las de brindar a sus pacientes aquella atención que, a la luz de los modernos medios de comunicación y enseñanza, y conforme al estado de conocimiento de la ciencia y práctica prevalecientes en la medicina, satisface las exigencias profesionales generalmente reconocidas por la propia profesión médica. *Cruz v. Centro Médico de P.R., supra*, a la pág. 731 (1983); *Oliveros v. Abréu,* 101 D.P.R. 209, 226 (1973).

**B**

En la causa ante nos, los apelantes sostienen que de la única manera que los apelados pueden respaldar su imputación de negligencia es mediante el testimonio pericial del Dr. Day. Este opinó, en esencia, que constituye negligencia que el profesional de la salud, después de percatarse de que ha tocado el nervio lingual con la inyección de anestesia, continúe administrándola e inyectándola directamente dentro del nervio. Concluyó, específicamente, que, conforme la sintomatología narrada por el Sr. Del Monte, eso fue lo que ocurrió en este caso.

Plantean, además, que esta conclusión es hipotética y no puede aceptarse para fundamentar esa determinación de hechos. Sostienen que: (1) el Dr. Day nunca examinó personalmente al demandante, limitándose sólo a llegar a sus conclusiones a base de su estudio de los récords médicos que le fueran sometidos; (2) llegó a esta conclusión exclusivamente basándose en la narración de la sintomatología que el demandante mismo proveyó; (3) que ninguno de los médicos que examinó al paciente ha encontrado un hallazgo concreto de daño permanente al nervio lingual, y que (4) de la única manera que se puede sostener la negligencia del Dr. Ramírez Brunet, conforme la evidencia desfilada por los apelados, es si se llega a la determinación de que se depositó anestesia dentro del nervio lingual del Sr. Del Monte, aquilatándole y concediéndole credibilidad a la versión de éste de cómo fue que ocurrieron los hechos cuando se le administró

la anestesia.

Un desapasionado análisis de toda la prueba presentada demuestra que los tres (3) peritos que prestaron testimonio en el juicio, a saber, el Dr. Reed Day, perito de los apelados, el Dr. Josué Castillo, perito de ocurrencia y daños de los apelados; y el Dr. José Lomba, perito de la parte apelante, coincidieron en cuanto a que durante la administración de anestesia o bloqueo mandibular que era necesaria para tratarle el diente al Sr. Del Monte, el que el profesional dental toque, pinche, o atraviese el nervio lingual con la aguja de anestesia no constituye negligencia, y que, de hecho, es un incidente inherente a dicha anestesia, y de ocurrencia rarísima. Como hemos expuesto anteriormente, la literatura médica estipulada por las partes confirma esta aseveración.

El perito de los apelados, el Dr. Reed Day, testificó que el nervio lingual puede ser afectado o herido como consecuencia normal de este tipo de procedimiento; que en estos casos cuando el paciente le informa al médico que tiene la sensación de un *"shock"* eléctrico durante la administración de anestesia en el procedimiento, el médico debe **retirar** la aguja y **reinsertarla** en otra posición. ■ Si el médico no retrotrae y redirige la aguja de anestesia, y continúa administrando la anestesia de manera que ésta es depositada directamente dentro del nervio lingual en cantidad significativa, puede resultar tóxica al nervio y causarle daño.

Opinó, además, que el mero tocar, pinchar o traspasar el nervio lingual durante la administración de la anestesia por inyección en un bloqueo mandibular causa una profunda sensación de dolor y, en ocasiones, un daño mínimo o temporero al tejido de este nervio; que duración de este daño puede variar de manera impredecible entre cada paciente desde unas semanas hasta varios meses y que el tratamiento adecuado y recomendado en estos casos es la prescripción de vitaminas con alta concentración de complejo de vitamina B, que ayuda a la regeneración del tejido neural afectado. Opinó, también, que esta regeneración se da de manera espontánea, aunque el período de recuperación tiene un amplio espectro de variación en cada paciente. Este testimonio pericial fue confirmado por el segundo perito de los apelados, el Dr. Josué Castillo Crescioni, y por el propio perito de los apelantes, el Dr. José Lomba.

Los apelantes, sin embargo, entienden que el Tribunal no debió concederle credibilidad al testimonio del Dr. Day aduciendo que éste se basaba en conclusiones obtenidas del récord médico del Sr. Del Monte y no de la evaluación del sujeto. No tiene razón.

### C

La Regla 52 de las de Evidencia, 32 L.P.R.A. Ap. IV, dispone que:

*"Cuando conocimiento científico, técnico o especializado sea de ayuda para el juzgador entender la evidencia o determinar un hecho en controversia, un testigo capacitado como perito en relación con la materia sobre la cual va a declarar, podrá testificar en forma de opiniones o de otra manera."*

Por su parte, la Regla 56 de las de Evidencia, *supra*, prescribe, además, que:

*"Las opiniones o inferencias de un testigo pericial pueden estar basadas en hechos o datos percibidos por el perito o dentro de su conocimiento personal o informados a él antes de o durante el juicio o vista. Si se trata de materia de naturaleza tal que generalmente los expertos en ese campo descansan en ella para formar opiniones o hacer inferencias sobre el asunto en cuestión, la materia no tiene que ser admisible en evidencia."*

Conforme la Regla 57 de las de Evidencia, *supra*, no será objetable la opinión o inferencia de un perito por el hecho de que se refiera a la cuestión que finalmente ha de ser decidida por el juzgador de los hechos. El **criterio rector** en relación con prueba de índole pericial lo es que la misma **resulte de ayuda** para el juzgador de hechos; siendo admisible dicho testimonio pericial **aun cuando** el mismo verse, precisamente, sobre la *"cuestión"* a decidir *("ultimate fact")* por el referido juzgador de los hechos. *Pueblo v. Canino*, 134 D.P.R. 796,

804 (1993); *Pueblo v. Marcano Pérez,* 116 D.P.R. 917 (1986); *Velázquez v. Ponce Asphalt,* 113 D.P.R. 39 (1982). El valor probatorio adjudicado al testimonio pericial es, por ende, una labor de la entera discreción del juzgador de los hechos quien mantiene la facultad para aceptar o rechazar la opinión emitida por el perito. *Pueblo v. Canino Ortiz, supra.*

Es indiscutible que la función de los peritos es ofrecer aquellos conocimientos para que el juzgador de los hechos tenga una mejor visión de lo sucedido. Son las personas con experiencia que tienen la función de abundar sobre temas que no son de conocimiento para cualquier persona que no se especialice en esa materia. Así pues, la función principal del Dr. Day en el juicio era ofrecer aquellos detalles sobre la mejor práctica en la medicina en los casos en que al insertar la aguja de anestesia se pilla, toca o traspasa el nervio lingual. También ofreció su opinión sobre las consecuencias que tiene el tocar el nervio lingual con la aguja y el tiempo de recuperación. Su testimonio al respecto estuvo corroborado por la literatura médica que la propia parte apelante sometió como evidencia por estipulación. Ello así, no venía obligado a evaluar al Sr. Del Monte para poder testificar sobre este procedimiento y no erró el Tribunal al darle credibilidad y estimar persuasivo su testimonio.

Respecto a si el tribunal de instancia actuó con prejuicio y parcialidad al creerle al Sr. Del Monte, tampoco encontramos que el error se haya cometido. No se nos ha demostrado otra cosa que no sea a un tribunal que evaluó la sintomatología narrada por el Sr. Del Monte en su testimonio, en el válido ejercicio de su obligación de aquilatar prueba y adjudicar controversias.

No podemos pasar por alto que aunque es cierto que tocar, pinchar o atravesar el nervio mientras se inyecta la anestesia no constituye negligencia *per se,* ya que es uno de los riesgos del tratamiento, para estos casos existe un procedimiento que debe seguirse. Según el testimonio del Dr. Day, y creído por el tribunal de instancia en el caso de que la aguja de anestesia toque, pinche o atraviese el nervio lingual, **hay que retirar la aguja e insertarla nuevamente desde otro ángulo.**

El propio Dr. Ramírez Brunet testificó que cuando el Sr. Del Monte se quejó de dolor, *"retrotrajo la aguja de anestesia unos milímetros y redirigió su ángulo más hacia donde se ubica el nervio alveolar".* ▇ Como ya expresamos, lo que procedía era retirar **por completo** la aguja y volverla a incertar desde otro ángulo, lo que según el propio testimonio del Dr. Ramírez Brunet, no hizo. El Dr. Ramírez Brunet procedió a injectar la anestesia con tan sólo haber retirado unos milímetros la aguja, debiendo conocer que había tocado, pinchado o traspasado el nervio lingual. Al no haber retirado la aguja por completo y haber depositado la anestesia, como él mismo testificara, incurrió en un acto de negligencia, ya que no actuó según la debida práctica de la medicina.

Esta acción negligente del Dr. Ramírez Brunet fue la causante de los daños sufrido por el Sr. Del Monte y que el Tribunal estimó que eran los síntomas referidos por el Sr. Del Monte. Esta conclusión está sostenida por otra evidencia presentada en el juicio.

Según la propia literatura médica presentada como evidencia:

*"When a needle penetrates a nerve, it may also penetrate a central arterial or epineural vessel, resulting in hemorrhage, which produces pressure on the nerve fibers. The result is disruption in function and metabolic process."* ▇

Está, además, que:

*"The manifestation of lingual nerve damage can be very distressing to de patient, both physiologically and psychologically. In adition, the dentist undergoes frustration during the patient's recovery period.*

*The symptoms of lingual nerve damage are classified as follows:*

*1. Paresthesia. Generally described as altered sensation raging from pain, cold warmth, and numbness to tingling, picking, tickling, and burning.*

*2. Hyperesthesia. Also an altered sensation, but specifically hyperacute. Generally a sign of recovery, but very stressful to the patient becomes over sensitive to stimuli.*

*3. Dysesthesia or hypoesthesia. An impairment of sensory perception, a condition in which there is a lessened but not complete loss of sensation.*

*Total sensory loss is a grave sequela of nerve damage known as anesthesia.*

***The clinical presentation of lingual nerve damage is numbness in the anterior two thirds of the involved side of the tongue.** Because of lack of sensation in this area, **the patient may easily bite or chew the tongue without feeling it.** The practitioner must inform the patient of the hazards of this condition. During the period of numbness, the patient should avoid hot foods to prevent burning the area, take warm salt water rinses at bedtimes, and massage the area periodically to increase blood circulation.*

. . .

***Regeneration time may vary and is strongly correlated with the kind of injury and the age of the patient.** The minimal amount of time for return of sensation is four to six weeks. If no axonal penetration occurs within one to two years, **the connective tissues pathways no longer posses the potential for regeneration, and the damage is permanent.** Surgery would be a consideration in such a case, depending in the overall benefit to the patient and whether or not it would outweigh the paresthesia/anesthesia."* ■

Aunque los peritos no hayan expresado que entendían que el daño sufrido por el Sr. Del Monte era de carácter permanente, el tribunal de instancia estaba en condiciones de determinar esto, considerando la propia literatura médica presentada como evidencia y el testimonio del Sr. Del Monte.

Téngase presente que tanto los peritos como la literatura médica sometida como evidencia indican que el tiempo de recuperación del nervio lingual debe ser de unos seis meses, y pueden ser permanentes. Atendido ello, como los hechos tuvieron lugar en 1995 y el juicio en su fondo se celebró en 2000, no erró el tribunal *a quo* al concluir que el daño sufrido por el Sr. Del Monte era permanente y que el mismo había sido causado por la negligencia del Dr. Ramírez Brunet. Tales hechos son inferencias permisibles y de fuerte valor probatorio, en las circunstancias descritas y si se considera la evidencia circunstancial presentada.

## V

En el análisis final, los errores señalados por los apelantes no se cometieron. El tribunal de instancia determinó correctamente que el Dr. Ramírez Brunet no obtuvo el consentimiento informado del Sr. Del Monte al momento de realizar el tratamiento de *"root canal"* que diera origen a la reclamación adjudicada mediante la sentencia apelada y que fue negligente al proveerle sus servicios médicos. No podemos concluir que el tribunal de instancia actuara con prejuicio y parcialidad al evaluar la prueba presentada ante su consideración, al determinar que el Dr. Ramírez Brunet había sido negligente y que los daños sufridos por el Sr. Del Monte fueron la consecuencia de tales actos. No vemos la necesidad de alterar el dictamen emitido por dicho Tribunal.

Por los fundamentos antes expuestos, se confirma la sentencia apelada.

El Juez Ortiz Carrión concurre con el resultado sin opinión escrita.

Lo acordó el Tribunal y lo certifica la Secretaria General.

Aida Ileana Oquendo Graulau
Secretaria General

### ESCOLIOS 2002 DTA 106

**1.** La demanda original del caso de epígrafe se presentó el 6 de febrero de 1996 y fue enmendada el 11 de marzo de 1996, previa contestación del demandado. Los apelantes formularon su contestación a la demanda enmendada el 3 de abril de 1996. La demanda fue enmendada por segunda vez el 21 de enero de 1997 para añadir alegaciones de daños y causa de acción por falta de consentimiento informado. El demandado contestó esta segunda demanda enmendada el 10 de febrero de 1997.

Se le efectuó una tercera enmienda a la demanda el 24 de febrero de 1998, nuevamente adicionando daños identificando correctamente a la codemandada, Continental Casualty Cmpany, compañía aseguradora del Dr. Ramírez Brunet. El demandado formuló su contestación a la tercera demanda enmendada el 7 de mayo de 1998 y quedaron así trabadas las controversias.

**2.** Conforme esta regla, tiene que, también, ser acogida por el tribunal.

**3.** Intimó allí dicho foro que este marco doctrinal no estaba encontrado con sus declaraciones previas emitidas en *Rodríguez Crespo, supra,* de que *"el médico tiene la obligación de divulgarle al paciente los riesgos **razonablemente previsibles**, así como los beneficios de tratamientos y procedimientos invasivos del cuerpo humano y de las alternativas disponibles. También debe informar al paciente sobre los riesgos probables relacionados a no tratarse la condición"*, ello en virtud de que en este caso había citado con aprobación la doctrina establecida en *Canterbury*, sobre *"el paciente razonable"*. Se refiere a la tendencia minoritaria que utiliza, para determinar el alcance y lo que constituye el consentimiento informado, la figura del *"paciente razonable"* anunciado por el Tribunal de Circuito de Apelaciones para Washington D.C. en el caso de *Canterbury v. Spence*, 464 F. 2d. 772 (D.C. Cir. 1972).

**4.** Exposición Narrativa de la Prueba, pág. 3.

**5.** Exposición Narrativa de la Prueba, pág. 29.

**6.** Rahele F. Rezai, Neil C. Bayley, Kim Austin, *Lingual nerve damage: causative factors and management,* Quintessence International, Vol. 19, No. 4, pags. 296, 1988.

**7.** *Id.* a las págs. 297-298.